**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dana W. FEUILLERAT, Defendant and Appellant.**

**No. 12879.**

Supreme Court of South Dakota.

Argued Feb. 22, 1980.

Decided May 21, 1980.

Margaret Crew, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellant.

BERNDT, Circuit Judge.

The defendant was found guilty of murder by a jury on June 30, 1979.* This is an appeal from his conviction which resulted in a mandatory sentence of life imprisonment.

Defendant, James Lee Perdue III, and Jeffrey K. Gill left Wichita, Kansas, for South Dakota in Gill's pickup on March 16, 1978, to steal some furs. They arrived in South Dakota on March 17, 1978, and stopped at a filling station after having checked out several places which sold furs. While Gill was making some telephone calls, defendant and Perdue had a conversation. According to Perdue's testimony, he indicated an unwillingness to go through with the thefts, and defendant said, "Well, we could kill Jeff. He has two or three thousand dollars and take his money." There was no other conversation in this regard. After Gill returned to the pickup, they continued driving and arrived at Arlington, Kingsbury County, South Dakota, on the evening of March 17, 1978, where they checked into the Pheasant Motel.

On March 18, 1978, at 2:30 a. m., a Dana Feuillerat registered at the Airport Holiday Inn, Sioux Falls, South Dakota, and paid the room rate for two people.

On March 18, 1978, North Central Airlines sold tickets to D. Feuillerat and L. Perdue, to Wichita, Kansas, on a flight departing Sioux Falls at approximately 4:00 p. m. on that date.

On March 19, 1978, some items of clothing and knives, later identified as belonging to Gill, were found along a road about six miles southeast of Arlington.

On March 23, 1978, a body was discovered behind a snowdrift alongside a road about a mile or two from where the above items had been found. There was a shoelace tied around the left wrist. A washcloth tied with a shoelace, shoes, parts of shoelaces, and an empty liquor bottle were found near the body. The pockets of the blue jeans were turned inside out.

On April 19, 1978, Gill's pickup was located at the Sioux Falls, South Dakota, airport with the license plates missing.

On May 4, 1978, a statement was given by defendant, which was admitted into evidence over objection, in which he implicated himself in Gill's death. He denied any intent or design to effect the death, but admitted to disposing of the body with the help of Perdue. In essence, defendant's statement was as follows: They were "high" on drugs after arriving at the Pheasant Motel, and he got into a violent argument with Gill about how to take out a certain alarm system without getting caught. This led to fighting, wrestling, tearing up the room, and loud yelling and cursing by Gill. Defendant, with the help of Perdue, tried to hold Gill in an effort to quiet him down, and a pillow was put over his face to muffle his yells and thus avoid an investigation for a disturbance. According to defendant's statement, "He [Gill] just passed out and nothing we did would make him come back. He wouldn't wake up. We sat there and he went cold and we didn't know what to do; and so we decided we better get rid of him because if we told anybody, we would get caught for killing him, but we didn't kill him on purpose."

Perdue took Gill's money, a little over $1,000.00, before loading the body into the pickup. Defendant said they also loaded up pieces of a chair which had been broken in the fight. After unloading the body out in the country, they drove down the road, throwing out any items which might connect them with the pickup. Defendant said they also threw some items into garbage cans at a Sioux Falls gas station. They did not want to take the pickup back, so they decided to split the money and fly home.

The manager of the motel in Arlington testified that she cleaned the room the

---

* At the time this offense was committed, SDCL 22–16–4 provided that "Homicide is murder when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being . . . .."

morning of March 18, 1978, and noted that one bed was quite messed up and had a blanket missing. The other bed looked like someone had lain on it but had not used the covers. The manager also testified that the furniture was all right and that none of the chairs were missing.

Perdue had previously been tried and convicted of manslaughter in the second degree in connection with Gill's death and was serving a sentence in the South Dakota State Penitentiary at the time of defendant's trial. His testimony varied greatly from that of defendant. According to Perdue, the following events happened after they arrived at the motel in Arlington on the evening of March 17, 1978: There was no conversation with Gill, who came into the room, went to the bathroom, took off his shoes and then went to bed without removing the rest of his clothes. Defendant lay on a second bed, and Perdue sat on the edge of the bed watching tv. Gill was asleep in five or ten minutes. None of the three had consumed any controlled substances or liquor that day. In a conversation that followed between defendant and Perdue, Perdue said he did not want to go through with stealing furs. Defendant then outlined a plan to frighten Gill into giving them some money to get back to Kansas or into taking them back. Perdue followed instructions to tie one of Gill's hands to the bed with a shoelace and tied up a washcloth to silence Gill if necessary. Perdue was to grab Gill's feet while defendant was restraining Gill and ordering him to give the two some money or take them back to Kansas. Perdue went on to testify that defendant said,

> on the count of three, grab his ankles and I will jump on top of him. . . . Just as soon as Dana (defendant) jumped on top of him Jeff (Gill) started kicking real bad and I let go and then I heard Jeff gasping for air and he says, "Dana, please," and I told Dana to stop but he says, "if I stop now," he says, "he will have me killed" and then they fought to the floor and the next thing I knew he wasn't moving.

During this struggle, defendant had Gill around the throat.

The remainder of the accounts told by defendant and Perdue concerning the post-death events substantially coincide.

Defendant's appeal raises ten issues, only some of which we will discuss in detail.

I

The trial court erred in denying defendant's motion for judgment of acquittal for the following reasons:

a. That there was not sufficient corroboration as a matter of law, of the testimony of accomplice, James Lee Perdue III.

The law applicable to this case prohibits conviction upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. SDCL 23–44–10 (now SDCL 23A–22–8). It is not required that corroborative evidence be produced which, by itself, would sustain a conviction. *State v. Moellar*, 281 N.W.2d 271 (S.D.1979); *State v. Rauscher*, 267 N.W.2d 582 (S.D.1978); *State v. Stecker*, 79 S.D. 79, 108 N.W.2d 47 (1961). The statute is satisfied if such evidence in some substantial degree tends to (1) affirm the truth of the testimony of the accomplice, and (2) establish the guilt of the defendant. *State v. Moellar*, supra; *State v. Drapeau*, 45 S.D. 507, 189 N.W. 305 (1922); *State v. Levers*, 12 S.D. 265, 81 N.W. 294 (1899). Corroborative evidence need not confirm every material fact testified to by the accomplice. *State v. Larmond*, 244 N.W.2d 233 (Iowa 1976); *State v. Trogden*, 258 Iowa 574, 139 N.W.2d 393 (1966); *State v. Binns*, 194 N.W.2d 756 (N.D.1972). The degree of evidence deemed sufficient is for the determination of the jury. *State v. Walsh*, 25 S.D. 30, 125 N.W. 295 (1910). The defendant himself can provide the necessary corroboration. *State v. Jochims*, 241 N.W.2d 25 (Iowa 1976).

■ Although denying intent or premeditation, defendant by his statement placed himself in the room with the accomplice and decedent and admitted participating in action which led to the death. In addition, the evidence includes the tied-up washcloth found with the body, the motel registration of defendant near the airport where the abandoned pickup was found, the flight tickets, and the testimony of the pathologist that there were hemorrhages in the back and both sides of the neck, which the jury could consider in weighing the evidence of strangulation. In our opinion, there is ample corroboration.

 b. That there was insufficient proof as a matter of law of the corpus delecti.

SDCL 22–16–2 states: "No person can be convicted of murder . . . unless the death of the person alleged to have been killed, and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt."

■ The corpus delecti in a murder case consists of (1) the fact that a human being is dead, and (2) the fact that the death was caused by the criminal act or agency of another person. 40 Am.Jur.2d *Homicide* § 432 (1968).

■ The fact of Gill's death is undisputed.. The eyewitness, Perdue, presents a picture of death by criminal act. The pathologist's testimony of hemorrhages and bruises about the neck substantiates Perdue's testimony that defendant had grasped Gill around the throat until he quit moving. Accordingly, there is sufficient proof of the corpus delicti.

 c. That there was insufficient evidence as a matter of law as to the element of premeditation.

■ The jury was properly instructed on premeditation and found by its verdict that it existed. We review the evidence to determine its sufficiency in a light most favorable to the verdict. *State v. Marshall*, 264 N.W.2d 911 (S.D.1978).

■ In determining the sufficiency of evidence to establish a premeditated design to effect death in murder cases, the courts generally consider the following factors of importance, viz: the use of a lethal or deadly weapon; the manner of the killing; the accused's conduct before and after the killing; and whether or not there was provocation. *State v. Marshall*, supra. Albeit no deadly weapon was employed here, the remaining factors are applicable: Perdue testified that earlier in the day defendant had suggested killing Gill and taking his money. He testified to the carefully-planned scenario in the motel room. The evidence includes the folded washcloth tied with a shoelace and the photograph of the body with the shoelace still tied around the left wrist. The motel room was in normal condition the following morning, except for the missing blanket, contrary to defendant's story of the violent fistfight. There is evidence that defendant took Gill's money, disposed of his body and personal belongings, and told Gill's girlfriend that Gill had gone on to New York.

There is conflicting evidence of provocation. Defendant stated that Gill became violent and had to be restrained, whereas Perdue said that Gill was sleeping. It was for the jury to determine which story to believe. The evidence amply supports the jury's implicit finding that there was sufficient proof of defendant's premeditated design to effect the death of Gill.

## II

The trial court erred in allowing the state to call Perdue as a witness at the trial, as he was then confined in prison.

SDCL 19–5–5 provides: "A person confined in any prison in this state may, by order of any court, be required to be produced for oral examination in the county where he is imprisoned."

SDCL 19–5–6 provides: "Except as provided by § 19–5–5, the examination of a person confined in any prison in this state must be by deposition. . . ."

At the time of the trial in Yankton County, Perdue was an inmate at the state penitentiary in Minnehaha County.

Upon application by the state the circuit court issued an order for the production of Perdue for the purpose of testifying at defendant's trial. Defendant objected to any testimony by Perdue on the grounds that it was prohibited by SDCL 19–5–6–.

Defendant claims no specific prejudice resulting from Perdue's oral testimony, as opposed to use of his deposition. Accordingly, we find no error.

### III

The trial court erred in failing to grant defendant's motion for a new trial made on the grounds of newly discovered evidence.

The newly discovered evidence relied on by defendant is as follows: (1) That the State's key witness, Perdue, perjured himself in testimony relating to promises that had been made to him prior to his testifying. (2) That Perdue made a prior inconsistent statement to the effect that it was he, and not the defendant, who committed the actual murder.

Perdue testified at defendant's trial on June 27, 1979. The case was submitted to the jury on June 30, 1979, and, apparently, on that same date an order was signed by Judge Evans, who had presided at Perdue's trial, which reduced Perdue's sentence to time served and placed him on probation. This action was taken without the knowledge of the court, the State or the defense in the instant case, although both the State and the defense were aware of the fact and had been advised that Perdue's attorney had been working on his early release and would be presenting a motion to Judge Evans some time subsequent to his testimony at defendant's trial. A careful review of Perdue's testimony fails to support defendant's allegation that he lied regarding promises made to him. The only relevant questions by the defense on this matter were as follows:

"Q The question, Lee, was, the time you are serving or your sentence right now is in conjunction with a conviction for second degree manslaughter. Isn't that correct?

A Yes, Sir.

Q And you are presently still represented by Counsel. Isn't that true?

A Yes, Sir.

Q And he has indicated to you that subsequent to your testimony here today he would at least make a motion to attempt to arrange some type of early release. Isn't that correct?

A He has been working on that since I have been locked up."

On redirect, the following question was asked by the State and answered by Perdue:

"Q To your knowledge, your personal information, has any deal been made between your Counsel and the State?

A Not that I know of."

It is noted that Perdue's attorney was present with him at the trial and undoubtedly could have been questioned as to the current status of Perdue's pending release.

There is nothing in the record to support an allegation of perjury or to indicate that there was a deal between Perdue's counsel and the State. Perdue answered the questions propounded. If, in fact, he had knowledge of an agreement with someone other than the State to secure his early release, there is no indication that such knowledge affected his testimony, nor can he be faulted for not volunteering the information. The specific question was never asked. Therefore, we find no error in this regard.

The only other indication of a prior inconsistent statement upon which defendant further relies for his motion for a new trial is the affidavit of a fellow inmate. Perdue is alleged to have told this inmate, "I killed him while my partner held him." As was pointed out by the State at the hearing on the motion for a new trial, such a statement is inconsistent with the defendant's own sworn statement. The trial court, applying the basic tests for a motion for new trial set out in *State v. Gerdes*, 258 N.W.2d 839 (S.D.1977), determined that

there was no new evidence which would convince the trier of facts that a different verdict would probably result. The granting or refusing of a new trial upon the ground of newly discovered evidence is largely in the discretion of the trial court and unless there has been a manifest abuse of such discretion, this Court will not review the action of the trial court upon such motion. *State v. Gerdes,* supra; *State v. Coleman,* 17 S.D. 594, 98 N.W. 175 (1904); *Wilson v. Seaman,* 15 S.D. 103, 87 N.W. 577 (1901).

### IV

The trial court erred in denying certain testimony of defense witness Robert H. Circle.

 Perdue testified that he, defendant, and Gill had used no drugs on the day of the death. In his statement, defendant claimed that they were all high on drugs. To corroborate his statement, defendant called Lt. Robert H. Circle, an undercover narcotics agent from Kansas. Upon motion of the State, certain testimony of this witness was not allowed. An offer of proof shows that the testimony basically related to the fact that Lt. Circle was requested to assist a Kansas county with a narcotics investigation relating to Gill. Lieutenant Circle was working on this investigation at the time of Gill's death and was to set up drug buys from Gill. However, this was never accomplished and Lt. Circle never saw or met Gill. Lieutenant Circle could testify that law enforcement officers had told him Gill was dealing in cocaine and heroin and allegedly was a violent individual and generally had weapons around. Defendant contends that an important question for the jury to resolve was whether or not there were drugs involved and that if the jury determined drugs were involved, they would have believed the defendant's statement to that effect and could not have convicted him of murder. Further, that since the court instructed the jury as to the defense of self-defense, Lt. Circle's testimony was also admissible to show Gill's bad or violent character.

Any testimony by Lt. Circle as to what other officers told him about Gill was clearly inadmissible as hearsay. Testimony by Lt. Circle of his own participation in an investigation of Gill was ruled inadmissible as not relevant, the trial court agreeing with the State's contention that the relevancy of the testimony would be outweighed by its prejudicial effect. SDCL 19–12–2 and 19–12–3. The court rightfully pointed out that being suspected of crime is not confirmation of involvement, and that evidence of Gill's dealing in drugs would not necessarily go to his using drugs. The proffered testimony was properly excluded.

### V

The trial court erred in allowing introduction of defendant's statement and in denying his suppression motion.

 In the course of investigating this case, South Dakota law officers traveled to Kansas to interview defendant. They made arrangements with Kansas officials whereby defendant was taken into custody under a Kansas warrant for parole violation and initially interviewed by Kansas officers, to whom he made incriminating statements. He was then interviewed by the South Dakota officers, with his statement being recorded by an official court reporter. After his arrest and before his first interview, defendant called his mother and advised her of his arrest. It is not contended that defendant at any time requested to see or call a lawyer or that he requested his mother to do so. After receiving the call, defendant's mother went to the sheriff's office where defendant was in custody. On other occasions when defendant had been arrested, he had contacted her and she had made arrangements for legal representation for defendant. On this occasion she called a lawyer from the sheriff's office, who gave her advice to convey to defendant. She was continually denied access to defendant until the officers had completed taking his statement, a period of approximately four hours. She described defendant's educational background as very bad, defendant having passed the eighth grade in a special educa-

tion class and having a third grade reading and spelling ability.

Defendant contends that his statement was not voluntary, due to the procedure followed, due to his inability to understand because of extremely low mentality, and due to the denial of access by his mother until after the interview. There is no contention that the Kansas arrest was invalid, that defendant was not adequately advised of his *Miranda* rights, or that anyone used undue force or influence. There is nothing sinister or illegal about the strategy used by the officers to interview defendant. His rights were read to him at two different times. After each right was given, defendant said that he understood. He at no time indicated a desire to confer with a lawyer or with his mother. Apparently, being in custody was not a new experience for defendant, as his mother had arranged for representation on other occasions. A review of the record shows ample evidence to sustain the trial court's denial of the suppression motion.

### VI

The trial court erred in not instructing the jury as to the lesser included offense of simple assault.

The court instructed the jury on the essential elements of the crime of murder, and of the lesser included offenses of manslaughter in the first and second degrees.

Defendant made timely objection to a denial of his proposed instruction on simple assault. The Supreme Court of Wisconsin in *State v. Melvin*, 49 Wis.2d 246, 181 N.W.2d 490 (1970) stated:

The early cases point out and emphasize and we must stress again, because the question keeps recurring, that a determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. The evidence must throw doubt upon the greater offense

. . . . Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those included crimes which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed.

■ The trial court is not required to instruct the jury even as to those offenses which might be included, but which the evidence would not warrant. *People v. Berry*, 18 Cal.3d 509, 134 Cal.Rptr. 415, 556 P.2d 777 (1976); *State v. O'Connor*, 86 S.D. 294, 194 N.W.2d 246 (1972); *State v. Kapelino*, 20 S.D. 591, 108 N.W. 335 (1906).

■ The evidence herein is amply sufficient to show murder. An instruction on simple assault is not required unless there is some evidence which fairly raises an issue as to such lesser offense. We find no evidence in the record which would fairly raise such an issue.

### VII

The trial court erred in admitting testimony concerning the autopsy.

■ SDCL 23–14–9.1 provides that "Whenever a state's attorney or a coroner has reason to believe that a deceased person may have died in his jurisdiction by unlawful means, either of them may order and direct a physician or surgeon to perform an autopsy." The record indicates that arrangements for the autopsy on Gill's body were made by Deputy Coroner Spitzenberger with Dr. Richard Schultz, a pathologist associated with the Laboratory of Clinical Medicine in Sioux Falls, South Dakota. Mr. Dennis Akim, who was then employed by Dr. Schultz and his associates as a licensed physician's assistant specializing in pathology, commenced the autopsy at approximately 8:15 a. m., March 24, 1978. Doctor John F. Barlow, Mr. Akim's supervising physician in the Laboratory of Clinical Medicine, was present at the beginning of the autopsy.

The practice followed in eastern South Dakota is to permit a pathologist assistant such as Mr. Akim to perform autopsies under the direction of a pathologist. Doctor Schultz testified that he became involved at the conclusion of the autopsy, around noon on March 24. He rechecked and verified all of Mr. Akim's findings and examined the body and all of the organs that had been removed. He testified that his findings would not have been any different had he been present at the outset of the autopsy. The record thus does not support defendant's objections to the testimony of Dr. Schultz and Mr. Akim, and the trial court did not err in overruling them.

We have considered the remaining issues raised by defendant and conclude that they present no matters requiring reversal. Accordingly, the judgment of conviction is affirmed.

All the Justices concur.

BERNDT, Circuit Judge, sitting for FOSHEIM, J., disqualified.