STATE of South Dakota, Plaintiff and Respondent,

v.

Richard MARSHALL, Defendant and Appellant.

No. 11906.

Supreme Court of South Dakota.

April 12, 1978.

John P. Guhin, Asst. Atty. Gen., for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on brief.

Randal E. Connelly, Asst. Public Defender, Rapid City, for defendant and appellant.

HANSON, Retired Justice.[*]

In an information filed by the state's attorney of Pennington County the defendant, Richard Marshall, and Russell Means were jointly charged with the crime of murdering Martin Montileaux. A motion for severance was granted and the separate trials resulted in the acquittal of Means and the conviction of Marshall. Marshall appeals alleging error in the following matters:

I.  Denial of motions for change of venue; dismissal; continuance; a public opinion poll; and the appointment of an expert to conduct a public opinion poll;

II.  Denial of sequestration and individual voir dire of the jury panel;

III.  Insufficiency of the evidence;

IV.  Restriction of defendant's cross-examination of one of the state's witnesses;

V.  Rejection of a jury instruction on an informant's testimony; and

VI.  Refusal of instructions on malice aforethought.

## I.

## DENIAL OF DEFENDANT'S PRETRIAL MOTIONS

The motions for a change of venue, dismissal of the information, continuance of trial, a public opinion survey, and an expert to conduct a public opinion survey were jointly submitted by defendants Means and Marshall before they were granted separate trials. The motions were all based on the contention defendants could not receive a fair and impartial trial in Pennington County in violation of their constitutional rights because of substantial prejudicial publicity regarding Indian people, the American Indian Movement, defendants, and Russell Means, in particular.

The motions were supported by an affidavit containing copies of news articles appearing in the Rapid City Journal, the lead-ing daily newspaper in Pennington County. The articles relating to the shooting of Montileaux and defendants' arrests and detention were all factual reports of the incident. None of the articles contained an expression of opinion as to the guilt or innocence of either defendant.

In most of the reports Russell Means, a well-known A.I.M. leader, was headlined and given prominence, whereas Marshall received only secondary mention as a codefendant. The impact, if any, of such pretrial publicity was greatly diminished as to Marshall when separate trials were granted. The contention that Marshall could not receive a fair trial in Pennington County because of public prejudice and pretrial publicity is further weakened by the fact that Russell Means was acquitted of the charge by a Pennington County jury.

Other news articles appearing in the Rapid City Journal were unrelated to the Montileaux case. They were mostly news accounts of events, activities and trials throughout South Dakota involving Indians, the American Indian Movement and some of its leaders. General publicity of this nature involving a particular race or group, of itself, does not render a fair and impartial trial impossible for all members of such race or group. See *People v. Hisquierdo*, 45 Cal.App.3d 397, 119 Cal.Rptr. 378, involving a Chicano defendant; *Commonwealth v. Ravenell*, 448 Pa. 162, 292 A.2d 365, a street gang member; and *People v. Martin*, 37 Mich.App. 621, 194 N.W.2d 909, a drug pusher. In the present action the pretrial publicity was not extensive or inflammatory and no presumption of unfairness or prejudice could reasonably be inferred from it. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344.

Defendant contends the denial of his motions for a public opinion survey and an expert to conduct such a survey precluded him from establishing actual prejudice to support his motions for a change of venue and for a continuance of trial. The record in this regard, however, shows there were

[*] In accordance with SDCL 16–15.

at least three public opinion surveys in existence and available to defendant which had been prepared for other trials in western South Dakota involving Indian defendants. Defendant failed to offer any of the public surveys in evidence and should not now be heard to complain he was totally deprived of an opportunity to prove the existence of public prejudice.

■ The grant or refusal of all of defendant's pretrial motions rested in the sound discretion of the trial court and we find no abuse of that discretion. The final test of whether or not defendant could receive a fair trial by an impartial jury came in the examination of the prospective jurors. Over 700 pages of the trial transcript is devoted to the voir dire process. Most of the questions were propounded by defendant's counsel who conducted a lengthy, unrestricted in-depth inquiry of every prospective juror as to possible bias or prejudice. Defendant did not exercise all of his peremptory challenges to the original panel of twelve or to the alternate jurors finally selected. No claim is now made that any member of the jury was biased, prejudiced, or disqualified for any reason.

## II.

## SEQUESTRATION AND INDIVIDUAL VOIR DIRE

■ This court recently considered the question of a defendant's right to conduct the voir dire examination of each juror outside the presence of other chosen or prospective jurors in the case of *State v. Bad Heart Bull, et al.*, S.D., 257 N.W.2d 715, in which the court concluded "there is no 'right' or 'requirement' that prospective jurors be individually examined out of the presence of other jurors. That is a precautionary procedure which may be permitted, in the discretion of the trial court, in cases surrounded by massive publicity and involving controversial issues."

For all the reasons stated in Section I, we find no abuse of discretion in the trial court's order denying the sequestration and individual voir dire of the prospective jurors in this case.

## III.

## SUFFICIENCY OF THE EVIDENCE

■ Defendant particularly questions the sufficiency of the evidence to prove a premeditated design to effect the death of Martin Montileaux. As the trial court instructed the jury, this is one of the essential elements of the crime of murder which the state must prove beyond a reasonable doubt. The jury was further correctly advised the term "premeditated design to effect the death" means:

"[A]n intention, purpose or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed.

A statute of this State provides that a premeditated design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution. It is further provided that such design to effect death may be inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed. Such an inference is nothing more than a permissible deduction from the evidence and it is for the jury to determine whether or not such an inference is to be made in view of all the facts and circumstances shown."

See *State v. Godlasky*, 47 S.D. 36, 195 N.W. 832; *State v. Buffalo Chief*, 83 S.D. 131, 155 N.W.2d 914; and *State v. Kindvall*, 86 S.D. 91, 191 N.W.2d 289.

By its verdict the jury found the requisite "premeditated design to effect death" existed. In reviewing the evidence to determine its sufficiency, we do so in a light most favorable to the verdict. Accordingly, the record evidence shows that Martin Montileaux, an Indian male, entered the Longhorn Bar in Scenic, South Dakota, sometime in the afternoon of March 1, 1975. He was accompanied by his sister-in-law Marian Poor Bear, one Richard Weston, and a girl

named Natonabah. For the most part, the group occupied a booth and drank beer throughout the afternoon and evening. During the evening there were approximately twenty customers in the bar.

About midnight a group of A.I.M. Indians entered the bar and started "milling" around. In the group were the defendant Marshall and his wife, Russell Means, David Clifford and his wife, Dusty Labeau, Joe Bat Richards, Red Colombe, Monica Cisneros, Evelyn Bordeaux, Rose Lee Janis, Webster Poor Bear, Bap Dubray, John Thomas, and Lester Lonehill. The owner of the bar, Halley Merrill, became concerned and instructed his grandson to call the sheriff.

Shortly after the group of Indians arrived, Martin Montileaux went into the men's room located in the rear area of the bar. He was immediately followed by defendant Marshall and Russell Means. Soon afterwards a "thump" was heard and then a shot. Defendant and Means came out of the restroom smiling. After a brief interval defendant and the other members of his group left the bar.

Martin Montileaux was found lying on the floor of the restroom with a small hole in his neck. When asked by the Deputy Sheriff Phillips whether he knew who shot him, he replied "Russell Means' friend." Montileaux died several days later from the effects of the shot. The bullet had entered his front throat, severed his spinal cord, and lodged in the back of his neck. While in the hospital Montileaux described to Deputy Sheriff Phillips the man who shot him was "shaggy haired" and wore "an army jacket."

Following the shooting, defendant, Means, and other members of their group got into cars and started towards Rapid City, South Dakota. Defendant and Means were passengers in a Ford car driven by David Clifford. The car was intercepted and followed for seventeen miles by the sheriff in a pickup with a red light and by a patrol car with a siren and red lights. The car was being driven erratically from one shoulder to the other and at speeds varying from 40 to 80 miles per hour. During the ride Means and the defendant exchanged jackets. The chase ended in the outskirts of Rapid City when the Ford turned into a trailer court. As it attempted to leave the sheriff struck and stopped it. Means and the defendant were placed under arrest.

In the car occupied by defendant and Means the officers found two rifles and three pistols. All were loaded. One of the pistols was a "22 long rifle revolver" containing five loaded shells and one empty shell in its cylinder.

The bullet removed from decedent's neck and the 22 revolver were sent to the Federal Bureau of Investigation for examination. The special agent, who examined the exhibits, testified the bullet was a 22 long rifle caliber lead bullet containing shearing marks caused by a misalignment of the cylinder of the weapon from which it had been fired. He also testified the revolver had a cylinder misalignment which could cause a shearing mark on bullets fired from it. However, he could not testify the bullet removed from decedent's neck was fired from the revolver removed from the defendant's car "to the exclusion of all other weapons" as shearing was a common occurrence in cheaply made guns.

Myrtle Poor Bear testified she attended a party at the Marshall home shortly after he was released on bail. During the course of the evening defendant came over to the table where Myrtle was sitting and told her:

"You know, that guy that got killed at Scenic?" I said, "Yeah." He said "I asked the guy if that was the right one and he said, 'yeah,' it was," so he said, "We waited for him and we followed him in the bathroom," and then he said, "I pulled the trigger." He said, "I'll never forget the look on that son-of-a-bitch's face as he went down."

At another later party Myrtle Poor Bear stated defendant told her "I don't know why I shot him."

As the defendant points out there were some differences in the testimony of the various witnesses such as the failure of two

of the state's witnesses to correctly identify defendant at a preliminary hearing, the kind of jacket defendant was wearing the night of the shooting, and whether his hair was "shaggy" or combed in a pony tail. These are all matters of credibility and the weight and value to be given to the testimony of each witness. Their resolution was a matter for the jury. Not the members of this court.

■ In determining the sufficiency of evidence to establish a "premeditated design to effect death" in murder cases the courts generally consider the following factors of importance, viz: the use of a lethal or deadly weapon; the manner of the killing; the accused's conduct before and after the killing; and whether or not there was provocation for the killing.

Summarily applying the above factors to the evidence in this case it appears:

1. Defendant brought a deadly weapon to the Longhorn Bar and used it to shoot and kill Martin Montileaux.

2. The manner of killing was a planned execution. When decedent went into the restroom he was immediately followed by defendant and Means. Persons in the bar heard a thud and then a shot. Defendant and Means emerged smiling. Nothing was said about the man left dying on the floor of the restroom. They and their group immediately left the bar.

3. After a cool and calm departure from the Longhorn Bar the trip to Rapid City turned into frantic flight when the law enforcement officers intercepted and followed the cars. In an apparent effort to deceive and cover up the defendant and Means exchanged jackets.

4. There was no provocation whatever shown for the shooting.

5. At a party shortly after defendant was released on bail he braggingly admitted killing Montileaux.

■ Accordingly, in our opinion the evidence amply sustains the jury's implicit finding of defendant's premeditated design to effect the death of the decedent, Martin

Montileaux. It certainly would not support a finding of accidental death, a killing in the heat of passion, justifiable or negligent homicide.

## IV.

### RESTRICTED CROSS–EXAMINATION

■ With reference to this issue, defendant contends he was deprived of a fair trial by the undue restriction and limitation of his cross-examination of Myrtle Poor Bear by the following occurrence:

Q (By Mr. Connolly)
Do you remember Agent Price and the other agent of the F.B.I. telling you that they were going to have to reveal your cover because they needed your testimony over here desperately? Isn't that the situation that Agent Price told you?

A I don't remember.

Q You've been working for them since November and you asked that your cover not be revealed, isn't that true?

MR. KLAUCK: Your Honor, I'd object to any questions relating to any undercover efforts.

MR. CONNOLLY: I wasn't—

MR. KLAUCK: It's improper.

MR. CONNOLLY: I wasn't getting to what she was doing under cover. It's the fact of whether she was under cover or not.

MR. KLAUCK: That's highly improper, Your Honor, whether she's working as an informant for any law enforcement agency.

THE COURT: Objection sustained.

The question objected to was confusingly dual in nature and assumed facts not in existence. As no reason for the ruling was given it could be justified on review as a correct result for a wrong reason. It is not necessary, however, as the trial court did not, in fact, restrict or limit defendant's further cross-examination of the witness as to her status as an informer for the F.B.I. Defendant's counsel did not believe himself restricted or limited in this regard as his next question to the witness was on the same subject:

(By Mr. Connolly:)

Q  In December when you talked to the agents, you were working with them, were you not?

A  I don't know.

The state made no objection to the question and there was no admonition or indication by the court the question was improper. Further inquiry on the subject was apparently voluntarily abandoned by defendant.

## V.

## INSTRUCTION AS TO AN INFORMANT'S TESTIMONY

▆ The trial court refused to give the following instruction requested by defendant:

"The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness, the jury must determine whether the informer's testimony has been affected by interest, or by prejudice against defendant."

Without question, a cautionary instruction of this nature should be given in a proper case. See *State v. Beene*, S.D., 257 N.W.2d 589, involving the testimony of an accomplice in which the court held it was reversible error to refuse a cautionary instruction similar to the one proposed by defendant herein.

In the *Beene* case the witness was an admitted accomplice who was given immunity from prosecution for his testimony. In the present action the trial court properly refused to give the requested cautionary instruction because the record fails to show that Myrtle Poor Bear was, in fact, an

informer. The only direct evidence on the subject was to the effect that no one offered her anything to testify and she was doing so on her own volition.[1]

## VI.

## MALICE AFORETHOUGHT AS AN ELEMENT OF THE CRIME OF MURDER

SDCL 22–16–4 states: "Homicide is murder when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being." In accordance with this statutory definition the trial court instructed the jury the essential elements of the offense of murder, each of which the state must prove beyond a reasonable doubt, are:

"1.  That the defendant at the time and place alleged in the information inflicted an injury or injuries upon the deceased from which the deceased died.

2.  That the defendant did so with premeditated design to effect the death of the deceased.

3.  That the killing was without authority of law and without justification."

Defendant contends the trial court improperly and erroneously charged the jury by refusing to instruct that "malice aforethought", was an essential element of the crime. In support of his contention it is pointed out that SDCL 23–32–4 relating to the form and contents of criminal pleading provides:

"The indictment or information shall contain the title of the action, the name of the court in which it is presented or filed, and the names of the parties. It shall not

1. On June 3, 1977, the defendant's attorney filed a motion to remand the case to the circuit court for purposes of filing a motion for new trial or in the alternative for the purpose of filing a petition for post-conviction relief. Attached thereto was an affidavit by Myrtle Poor Bear denying that the defendant had made any of the statements which she had attributed to him and alleging that F.B.I. agents coerced her into perjuring herself. This motion was denied as being untimely because SDCL 15–30–1 allows a remand to be made only if the motion for a new trial can be made and hearing held thereon within the time allowed by law for appeal, and SDCL 15–6–60(b) sets a one year time limit on the granting of relief based on newly discovered evidence. The petition for post-conviction relief was untimely while an appeal was pending. SDCL 23–52–4.

be necessary to set out therein, with particularity, the facts relied upon to constitute the offense charged, and it shall only be necessary to allege the commission of the offense in the language by which the crime is usually designated; as, *in the case of an accusation of murder, that the accused (naming him) did, at a time and place stated, feloniously, willfully, and with malice aforethought, murder a human being (naming him);* or, in case of assault, or assault and battery, or rape, or carnal knowledge or abuse of a person, or assault with a dangerous weapon with intent to do great bodily harm or to kill, it shall only be necessary to charge that, at a time and place stated, the accused (naming him) did commit the crime of assault, or assault and battery, or rape, or carnal knowledge or abuse of a person, or assault with a dangerous weapon with intent to do great bodily harm or to kill, upon or against the person of a human being (naming him or her, as the case may be); and this form of pleading shall apply in all prosecutions for the commission of any public offense, and upon the trial it shall be competent to prove the manner in which the crime was committed as fully and as particularly as if all the facts constituting the crime had been fully alleged and set forth in the indictment or information presented or filed." (Emphasis added.)

The original source of SDCL 23–32–4 was Chapter 242 of the 1913 Session Laws. Its later appearance as SDC 1939, Section 34.-3007 was based on Supreme Court Rule 364. It is a procedural rule or statute intended to show the sufficiency of simplified pleading code crimes in indictments and informations in contrast to the technical and formalistic pleading of common law crimes.

Unfortunately and confusingly (see *State v. Edmunds,* 20 S.D. 135, 104 N.W. 1115 and *State v. Belt,* 79 S.D. 324, 111 N.W.2d 588) the illustration in SDCL 23–32–4 of pleading the crime of murder does not now, and never has, conformed to the substantive law of our state. At least since 1877 (see Pen.C. 1877, Section 242) malice

aforethought has not been an essential element of the crime of murder. It is now defined in SDCL 22–16–4, as it has been since 1877, as "homicide is murder when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being." The trial court therefore correctly refused defendant's requested instructions which included the element of "malice aforethought" as an element of the crime charged.

Finding no error, the judgment of conviction is accordingly affirmed.

All the Justices concur.

HANSON, Retired J., sitting for ZASTROW, J., disqualified.