Richard MARSHALL, Petitioner
and Appellant,

v.

STATE of South Dakota, Appellee.

No. 12982.

Supreme Court of South Dakota.

Argued Sept. 9, 1980.

On Reassignment May 20, 1981.

James D. Leach, Rapid City, and Kenneth E. Tilsen, St. Paul, Minn., for petitioner and appellant.

Miles F. Schumacher, Asst. Atty. Gen., Pierre, for appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

FOSHEIM, Justice (On reassignment).

Petitioner Richard Marshall was convicted of murder on April 6, 1976, and sentenced to life imprisonment. We affirmed that conviction in *State v. Marshall*, 264 N.W.2d 911 (S.D.1978). On June 15, 1978, petitioner filed a petition for post-conviction relief in the circuit court. This appeal is from an order denying such relief. We affirm.

The evidence shows that Martin Montileaux, an Indian male, entered the Longhorn Bar in Scenic, South Dakota, sometime in the afternoon of March 1, 1975. He was accompanied by several persons. They gathered at a booth and drank beer throughout the afternoon and evening. During the evening, there were approximately twenty customers in the bar.

At approximately midnight, a group of American Indian Movement members entered the bar and started "milling" around. The group included Richard Marshall and Russell Means. The owner of the bar became concerned and instructed his grandson to call the sheriff.

Shortly thereafter, Martin Montileaux went into the men's room located in the rear area of the bar. He was allegedly followed by petitioner and Russell Means. Soon afterwards, a "thump" was heard and then a shot. Petitioner and Means then came out of the restroom. After a brief interval, petitioner and the other members of his group left the bar, entered cars, and started toward Rapid City, South Dakota. Petitioner and Means were passengers in a Ford automobile, which was pursued for seventeen miles by the sheriff in a pickup with a red light and by a patrol car with a siren and red lights operating. The Ford proceeded erratically from one shoulder of the road to the other at speeds varying from 40 to 80 miles per hour. The chase ended on the outskirts of Rapid City when the Ford entered a trailer court. As it attempted to leave, the sheriff struck and stopped it with his vehicle. Petitioner and Means were placed under arrest.

In the car occupied by petitioner and Means, the officers found two rifles and three pistols. All were fully loaded, except a "22 long rifle revolver," which contained five loaded cartridges and one empty cartridge in its cylinder.

Martin Montileaux was found lying on the floor of the restroom with a small hole in his neck. When asked at the scene by a deputy sheriff whether he knew who shot him, he replied, "Russell Means' friend." Montileaux died several days later from the effects of the bullet, which had entered the front of his throat, severed his spinal cord, and lodged in the back of his neck. While in the hospital, Montileaux told the deputy sheriff the man who shot him was "shaggy haired" and wore "an army jacket."

The bullet removed from decedent's neck and the 22 revolver were sent to the Federal Bureau of Investigation for examination. The special agent who examined the exhibits testified that the fatal bullet was a 22 long rifle caliber lead bullet containing shearing marks caused by a misalignment of the cylinder of the weapon from which it had been fired. He also testified that the revolver had a cylinder misalignment that could cause a shearing mark on bullets fired from it. However, he could not state that the bullet removed from the decedent's neck was fired from the revolver removed from appellant's car "to the exclusion of all other weapons," because shearing is a common occurrence in cheaply-made guns.

The petition for post-conviction relief centers on the testimony of Myrtle Poor Bear. She testified at the trial that she attended a party at the Marshall home shortly after he was released on bail. During the course of the evening, petitioner came over to the table where she was sitting and said:

"You know, that guy that got killed at Scenic?" I said, "Yeah." He said "I

asked the guy if that was the right one and he said, 'yeah,' it was," so he said, "We waited for him and we followed him in the bathroom," and then he said, "I pulled the trigger." He said, "I'll never forget the look on the son-of-a-bitch's face as he went down."

Myrtle Poor Bear stated that petitioner told her at a later party: "I don't know why I shot him." She has recanted that testimony.

Petitioner contends that he is entitled to a new trial in light of Poor Bear's recantation. Petitioner also notes a statement made by a United States Attorney to the United States Court of Appeals for the Eighth Circuit that Poor Bear was an incompetent witness in federal proceedings [1] taking place at approximately the same time as petitioner's murder trial. In addition, petitioner argues that medical records of Poor Bear, which were not available at the murder trial, together with the testimony of her family, indicate that Poor Bear is a seriously mentally-disturbed woman, who often fantasizes and lies. At the post-conviction hearing, petitioner introduced Poor Bear's hospital records, which show that she frequently needed medical attention and had a problem with alcohol and drugs.

In *Pickering v. State*, 260 N.W.2d 234 (S.D.1977), this Court, for the first time, addressed the standards for granting a new trial based upon a witness' recantation of testimony. In that case, the petitioner's brother recanted and confessed that it was he who had committed the homicide. After careful review of the existing standards in different jurisdictions for granting a new trial based upon a witness' recantation, we adopted the standards set out in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), and stated that a new trial should be granted when:

'(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury *might* have reached a different conclusion (emphasis added in original).

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.'

*Pickering v. State*, supra, 260 N.W.2d at 235, quoting *Larrison v. United States*, supra, at 87–8. *See also United States v. Wallace*, 528 F.2d 863 (4th Cir. 1976); *Newman v. United States*, 238 F.2d 861 (5th Cir. 1956); *Gordon v. United States*, 178 F.2d 896 (6th Cir. 1949); cert. denied, 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950); *State v. Compiano*, 261 Iowa 509, 154 N.W.2d 845 (1967); 2 Wright, Federal Practice & Procedure § 557 (1969).

We further noted in *Pickering* that verdicts would be insecure if they could always be set aside upon the testimony of witnesses who recant their former testimony. Recanted testimony is exceedingly unreliable and is to be regarded with suspicion, particularly where the recantation involves a confession of perjury.

The record discloses that the State moved to endorse the name of Myrtle Poor Bear as a witness on March 23, 1976, six days before the trial was to begin, and that petitioner's counsel talked to her prior to her testimony. Myrtle Poor Bear was proficiently and effectively cross-examined at the murder trial.

■ In addition, the recited strong circumstantial evidence indicates that petitioner brought a deadly weapon to the Longhorn Bar and used it to kill Martin Montileaux in the manner of a planned execution. After a cool and calm departure from the Longhorn Bar, the trip to Rapid City quickly turned into a frantic flight from law enforcement officers during which, in an apparent effort at deception, petitioner and Means exchanged jackets and petitioner apparently removed his ponytail. Ordinarily, evidence of flight and deception, standing alone, is insufficient to convict, but when accompanied by other

---

1. Those proceedings involved the case of *United States v. Peltier*, 585 F.2d 314 (8th Cir. 1978), cert. denied, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

evidence, it may justify an inference of guilt. *United States v. Pennsylvania*, 267 F.Supp. 316 (E.D.Pa.1966), aff'd. 378 F.2d 372 (3rd Cir. 1967), cert. denied sub nom. *Gaspero v. Pennsylvania*, 389 U.S. 870, 88 S.Ct. 151, 19 L.Ed.2d 149 (1967). An attempt by the accused to flee following commission of the alleged crime is circumstantially relevant to prove not only commission of the act, but also the intent and purpose with which it was committed. *United States v. New Jersey*, 405 F.2d 632 (3rd Cir. 1969), cert. denied sub nom., *Yeager v. O'Connor*, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969). *See also: United States v. Blue Thunder*, 604 F.2d 550 (8th Cir. 1979), cert. denied, 444 U.S. 902, 100 S.Ct. 215, 62 L.Ed.2d 139 (1979); *United States v. Peltier*, supra. The 22 caliber pistol found in the vehicle carrying petitioner, which was examined by the F.B.I., was evidence that petitioner possessed or had access to tools, weapons, implements, or other articles with which the crime was or might have been committed and connected the accused with the offense. *State v. Schafer*, 297 N.W.2d 473 (S.D.1980); *State v. Brown*, 285 N.W.2d 848 (S.D.1979). That circumstantial evidence was fortified by the solid testimony of witnesses who saw petitioner enter and exit the restroom while it was occupied by the victim and during the time when the shot was heard, thus providing proof of opportunity. Finally, there was the eyewitness statement of the murder victim. Statements made under an obvious sense of impending death are deemed sufficiently reliable as to fall within an exception to the hearsay rule. SDCL 23A–22–12; *United States v. Mobley*, 421 F.2d 345 (5th Cir. 1970).

All such evidence is independent of the testimony of Poor Bear that after petitioner was released on bail, he braggingly admitted killing Montileaux. Admittedly, the evidence was not without contradiction. There were discrepancies in the testimony of various witnesses, such as the failure of two of the State's witnesses to correctly identify petitioner at a preliminary hearing. There were also some discrepancies with regard to the kind of jacket petitioner was wearing the night of the shooting and whether his hair was "shaggy or combed in a pony tail." These, however, were all matters of credibility, and the weight and value to be given to the testimony was resolved by the jury. Such discrepancies do not reflect upon the credibility of Poor Bear.

With regard to the statement of the United States Attorney in the *Peltier* case, the trial court noted that the remark was made by an individual in an unrelated proceeding in an effort to justify the disallowance of Poor Bear's testimony in that case. The trial court further specifically found that:

> [Poor Bear's] testimony at trial was subject to penetrating cross-examination, which clearly revealed significant inconsistencies in her testimony, which diminished its impact ... [upon] the jury.
>
> Myrtle Poor Bear is a very easily led individual of limited intelligence.
>
> Her testimony at the post-conviction hearing is fairly fraught with contradiction and is not credible.
>
> The testimony at the post-conviction hearing is less credible than that produced at the time of trial.
>
> The jury had overwhelming evidence at trial to base a verdict of guilt without the testimony of Myrtle Poor Bear. The jury would have concluded that the defendant was guilty had Myrtle Poor Bear not testified. The Court is not satisfied nor reasonably well satisfied that Myrtle Poor Bear's testimony at trial was false.

These findings of fact may not be set aside unless clearly erroneous. SDCL 15–6–52(a). *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). In *Pickering v. State*, supra at 236, we said: "At best, it is difficult for an appellate court to assess the veracity of witnesses by reference to a bare record. The trial judge is in a far better position to determine which version of [the recanting witness'] testimony is more likely the truth, having observed the demeanor of the witnesses."

Petitioner relies heavily on *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1

L.Ed.2d 1 (1956). In our view, that reliance is misplaced. In *Mesarosh*, the Solicitor General of the United States moved to remand the case to the trial court for further proceedings because of untruthful testimony given before other tribunals by a Government witness. The *Mesarosh* decision was based entirely upon the representations of the Government in its written motion and upon the statements of the Solicitor General during argument on that motion. The Supreme Court reversed the convictions and ordered a new trial, with this important limitation:

It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is "merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.

352 U.S. at 9, 77 S.Ct. at 5, 1 L.Ed.2d at 7. *Cf., United States v. Johnson*, 142 F.2d 588 (7th Cir. 1944), appeal dismissed, 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944); *United States v. Rutkin*, 208 F.2d 647 (3rd Cir. 1953).

In *Mesarosh*, the Court further distinguished its decision from facts similar to those in this case:

The present situation is different from that in *United States v. Flynn* (D.C.N.Y.) 130 F.Supp. 412, rearg. den., 131 F.Supp. 742. There the defense moved for a new trial on the basis of an affidavit in which a witness recanted his testimony after the trial. The Government charged that the recantation, rather than the testimony it contradicted, was the lie. Hence there was a factual issue to be determined at the outset, unlike the present case, where there is no conflict between the trial testimony and the subsequent matter brought forward by the Govern-

ment as bearing on credibility. This difference has been recognized by the courts as calling for the application of different tests in passing on a motion for new trial, even without the added distinction of this case that it is the *Government* which questions the witness's credibility. See, e. g., *United States v. Johnson* (7th Cir.) 142 F.2d 588, 591, 592, cert. dismd., 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643; *United States v. Hiss* (D.C.N.Y.) 107 F.Supp. 128, 136, affd. (2 Cir.) 201 F.2d 372.

352 U.S. at 12, n. 6, 77 S.Ct. at 7, 1 L.Ed.2d at 8–9.

The Court further noted:

Because the situation raised by the Solicitor General's motion is quite distinct from that of the ordinary defense motion for new trial, ... we would not consider ourselves bound on a review of the District Court's ruling in this situation by the limitations expressed with reference to the defense motion in *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562.

352 U.S. at 12, n. 7, 77 S.Ct. at 7, 1 L.Ed.2d at 9.

The limitations referred to in *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946) are stated as follows:

[I]t is not the province of this Court or the Circuit Court of Appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings. [Citations omitted] While the appellate court might intervene when the findings of fact are wholly unsupported by evidence, [citations omitted] it should never do so where it does not clearly appear that the findings are not supported by any evidence.

327 U.S. at 111–12, 66 S.Ct. at 466, 90 L.Ed. at 565–6.

It follows that the *Mesarosh* decision does not apply to the claims of petitioner. As we stated in *Pickering*, "the moving party has the burden of fulfilling the re-

quirements of all three standards before relief will be granted. Failure to meet any one of the three standards will defeat the movant's prayer for relief." 260 N.W.2d at 235. We conclude that petitioner has not met that burden. We are not reasonably well satisfied that Poor Bear's testimony was false or that, without it, the jury might have reached a different conclusion. We further conclude that petitioner was able to effectively cross-examine Poor Bear at trial. Here, there were factual issues to be decided and the trial court made a determination with regard to the recanted testimony under the *Pickering* standards. We cannot say that the court's findings are contrary to a clear preponderance of the evidence, nor are we left with a definite and firm conviction that a mistake has been committed. *Cunningham v. Yankton Clinic, P.A.*, 262 N.W.2d 508 (S.D.1978).

■ Finally, we reject petitioner's contention that reversal is required due to the prosecution's failure to comply with the murder trial judge's order to produce medical records of the witness, Poor Bear. We recognize that the suppression of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Reiman*, 284 N.W.2d 860 (S.D.1979); *Geelan v. State*, 85 S.D. 346, 182 N.W.2d 311 (1970). It is further clear that the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ Petitioner argues that knowledge of Poor Bear's history of drug abuse and psychological problems would have greatly affected her credibility before the jury and that the failure to produce her medical records thus amounted to a denial of due process. However, as we indicated in *State v. Reiman*, supra, not every failure to produce evidence under court order will require re-

versal, for "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976). *See State v. Sahlie*, 277 N.W.2d 591 (S.D.1979). In view of the strong circumstantial evidence of guilt presented at the murder trial, we cannot say as a matter of law that the medical records of Poor Bear would have been outcome-determinative in this case.

We have reviewed petitioner's remaining arguments and find them to be without merit. The order of the trial court is affirmed.

DUNN, MORGAN and HENDERSON, JJ., concur.

WOLLMAN, C. J., dissents.

WOLLMAN, Chief Justice (dissenting).

I agree with petitioner's contention that he is entitled to a new trial because of information concerning Myrtle Poor Bear that has emerged since the murder trial. First, Poor Bear has recanted the testimony she gave at the trial. Second, a United States Attorney stated to the United States Court of Appeals for the Eighth Circuit that Poor Bear was an incompetent witness in federal proceedings taking place at approximately the same time as petitioner's murder trial, representing to the Court of Appeals that there was absolutely no evidence that her affidavits with regard to those federal proceedings were correct. Third, the medical records of Poor Bear, which were not available at petitioner's original murder trial, together with the testimony of Poor Bear's family, indicate that Poor Bear is a seriously disturbed young woman who often fantasizes and tells stories and lies.

Poor Bear was first interviewed by agents of the Federal Bureau of Investigation sometime after two FBI agents were murdered at the Jumping Bull site near Oglala, South Dakota, on June 26, 1975. On February 19, 1976, she signed an affidavit stating that Leonard Peltier, who was

later found guilty of killing the two FBI agents,[1] was her boyfriend; that on June 26, 1975, Peltier knew that the FBI agents were serving a warrant on Jimmy Eagle; that Peltier told his companions to get ready to kill the agents; that she, Myrtle Poor Bear, left at that time and did not return; and that Peltier later talked to her about the killings and said that one of the FBI agents had surrendered but that he (Peltier) had kept on shooting.

On February 23, 1976, Myrtle Poor Bear signed a second affidavit, which in most respects was similar to the first affidavit. In the second affidavit, however, Poor Bear stated that she was present the day the FBI agents were killed and that she saw Peltier shoot the FBI agents. Poor Bear did not, however, describe the killings in any detail.

On February 24, 1976, Myrtle Poor Bear made a statement to an FBI agent in which she stated that not only was she at the scene of the murder, but that she had also tried to stop Peltier from killing the agents. Her statement included an explicit description of the point-blank murder of the FBI agents, a story about trying to get away from the scene of the murder and shooting at one of Peltier's companions, and the facts regarding her purported rape two days before the murder incident by nine of Peltier's companions.

On March 22, 1976, Myrtle Poor Bear was taken by FBI agents to Rapid City, South Dakota, where she made her first statement regarding the Martin Montileaux murder to Pennington County Deputy Sheriff Don Phillips. Poor Bear told Deputy Phillips that she knew Richard Marshall and his wife Cleo very well and related to him substantially the same story she later told at petitioner's murder trial.[2] Three days later Poor Bear was endorsed as a witness in petitioner's murder trial.

On March 31, 1976, just nine days after Poor Bear's first statement to Deputy Phillips, she signed her third and final affidavit concerning the murder of the two FBI agents. This affidavit provided an explicit description of the murder of the two agents. This time, however, she stated that she had tried to get away from the scene of the murder, was unable to, and was instead held by someone and therefore watched the point-blank shooting of the agents. It was two days after the signing of this final affidavit that Poor Bear testified in petitioner's murder trial. Petitioner's counsel at the time of the murder trial had no knowledge of these affidavits.

On April 13, 1977, Myrtle Poor Bear, in testimony given outside the presence of the jury in the trial of Leonard Peltier,[3] disclaimed virtually every allegation contained in the three affidavits about the killing of the two FBI agents. On May 11, 1977, Poor Bear, by affidavit, recanted both her testimony regarding the murder of Martin Montileaux and the murder of the two FBI agents.

On April 12, 1978, Evan L. Hultman, the United States Attorney who represented the prosecution in the Peltier murder trial, made certain statements in oral argument before the Court of Appeals for the Eighth Circuit during the argument in Peltier's appeal. Mr. Hultman agreed that it was a correct statement that Myrtle Poor Bear was a witness whose mental imbalance was so gross as to render her testimony unbelievable. During oral argument, the following exchange took place:

Judge Ross: But anybody who read those affidavits would know that they contra-

---

1. See *United States v. Peltier*, 585 F.2d 314 (8th Cir. 1978).

2. Other remarks made that day by Myrtle Poor Bear included the description of an episode where petitioner allegedly told Poor Bear that she knew a lot about him, after which a companion of petitioner apparently fired a shot towards Poor Bear, who fell to the floor to avoid the shot. Poor Bear also stated that petitioner might not show up for his trial and would instead go to Canada, and had asked her to join him.

3. The prosecution did not even call Myrtle Poor Bear as a witness. Rather, the defense called her to support Peltier's theory that the FBI had framed him by manufacturing evidence and inducing witnesses to testify against him. Poor Bear's testimony was subsequently not admitted into evidence. *United States v. Peltier*, supra, 585 F.2d at 332.

dict each other. And why the FBI and Prosecutor's office continued to extract more to put into the affidavits in hope to get Mr. Peltier back to the United States is beyond my understanding.

Mr. Hultman: Yes.

Judge Ross: Because you should have known, and the FBI should have known that you were pressuring the woman to add to her statement.

.    .    .    .    .

Mr. Hultman: ... I did read these affidavits and put together the fact that ... her story didn't later check out with anything in the record by any other witness in any other way. So I concluded then, in addition to her incompetence, first, that secondly, there was no relevance of any kind. Absolutely not one scentilla [sic] of any evidence of any kind that had anything to do with this case. And it was then that I personally made the decision that this witness was no witness. First of all, because she was incompetent in the utter, utter, utter ultimate sense of incompetency ... [and second] there was not one scentilla [sic] that showed Myrtle Poor Bear was there, knew anything, did anything, et cetera.

.    .    .    .    .

Mr. Hultman: [Myrtle Poor Bear] knew nothing, absolutely nothing, without question, about what took place.

Judge Ross: Was she there at the time?

Mr. Hultman: No, she was not....[4]

At petitioner's hearing for post-conviction relief, Myrtle Poor Bear testified that petitioner never told her that he had shot Martin Montileaux; that the FBI threatened her and her daughter to force her to testify; that she was taking medicine and drugs immediately before testifying in petitioner's trial; that she was not in Oglala at the time the two FBI agents were shot; that she had never even met Leonard Peltier until she testified at his trial; and that her three affidavits regarding the Peltier matter were false.

During the course of the post-conviction hearing, petitioner introduced Myrtle Poor Bear's hospital records, which were requested but not supplied at petitioner's trial. In summary, these records show that Poor Bear frequently needed medical attention, had a problem with alcohol and drugs, and frequently lied to hospital personnel.[5]

Myrtle Poor Bear's sister testified at the post-conviction hearing that Poor Bear has been making up stories since she was a child and that it is just a part of her personality. Poor Bear's sister stated that "[s]he was forever lying to us, making up stories, and we expected it." Poor Bear's father also testified that Poor Bear "makes up stories."

In *Pickering v. State*, 260 N.W.2d 234 (S.D.1977), this Court adopted the standards for granting a new trial based upon a witness' recantation of testimony. We stated that a new trial should be granted when:

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury *might* have reached a different conclusion (emphasis added in original).

---

4. See *United States v. Peltier*, supra, 585 F.2d at 335, n. 18, for the Court of Appeals' analysis of the government's use of Poor Bear's affidavits.

5. Examples of the apparent stories Myrtle Poor Bear would tell hospital personnel include:

1) On three occasions Poor Bear reported having fallen off a horse when in fact she had apparently never been thrown from a horse.

2) On two separate occasions Poor Bear reported that she had been gang raped in 1975. There is no evidence that this is true.

3) Poor Bear said she had one child and was getting married, whereas in fact she had two children and was not getting married.

4) Poor Bear said her former husband was trying to take her child away from her. Poor Bear never had a husband and the father of her children had never tried to take her children away from her.

5) Poor Bear said she had a boyfriend who was shot at Wounded Knee. Apparently this statement is not true.

6) Poor Bear, after being admitted to the hospital, told hospital personnel that she had been beaten several times in the previous month and had had to flee for her life several times.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*State v. Pickering,* supra, 260 N.W.2d at 235, quoting *Larrison v. United States,* 24 F.2d 82 (7th Cir. 1928). It is my opinion that application of the standards in *Pickering* to the facts in the instant case leads to the conclusion that petitioner is entitled to a new trial. I will address the three standards in reverse order.

## I

With regard to the third standard in *Pickering,* the question is whether petitioner was taken by surprise when Myrtle Poor Bear's allegedly false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

Without a doubt, petitioner was taken by surprise when he learned only six days before trial that the State intended to call Poor Bear as a witness. Although Poor Bear had been in contact with the FBI since at least February 19, 1976, she did not give her first statement to Deputy Phillips with regard to the Montileaux murder until March 22, 1976.[6] Petitioner requested a continuance as soon as Poor Bear was endorsed as a witness, but this motion was denied. Petitioner's counsel had no opportunity to talk to Poor Bear until the day she testified at the trial.

I agree with petitioner's contention that he was unable to meet Poor Bear's testimony. Petitioner did not know of the contemporaneous and apparently false affidavits given by Poor Bear with regard to the shooting of the two FBI agents, and did not even know Poor Bear's true relationship with the FBI. Moreover, petitioner was unable to review Poor Bear's medical history, which in itself would probably have had a substantial effect on her credibility.

The State nevertheless contends, and the majority opinion agrees, that Poor Bear was effectively cross-examined at petitioner's murder trial. Although I agree that Poor Bear was cross-examined as proficiently as was possible under the circumstances, it is my opinion that her credibility would have been rendered far more suspect, if indeed the State would even have called her as a witness, had petitioner's counsel at the murder trial been aware of the information that has come to light since the trial.

## II

The second question under the *Pickering* standards is whether the jury might have reached a different conclusion without Myrtle Poor Bear's testimony. It is my opinion that Poor Bear was a material witness at petitioner's trial and that the jury might have reached a different conclusion without her testimony.

The evidence at petitioner's murder trial was not without contradiction. In *State v. Marshall,* 264 N.W.2d 911, 915–16 (S.D. 1978), we stated:

As the defendant points out there were some differences in the testimony of the various witnesses such as the failure of two of the state's witnesses to correctly identify defendant at a preliminary hearing, the kind of jacket defendant was wearing the night of the shooting, and whether his hair was "shaggy" or combed in a pony tail. These are all matters of credibility and the weight and value to be given to the testimony of each witness. Their resolution was a matter for the jury.

The testimony of the various witnesses with regard to who was in the rest room at the time Martin Montileaux was shot is anything but clear-cut. Essentially, two witnesses testified that petitioner and Russell Means followed Martin Montileaux into the rest room, after which the witnesses claimed they heard a thump and then a

---

**6.** Poor Bear testified at the original murder trial that she had told the FBI about petitioner's alleged conversation with her sometime in late 1975, which would mean that the FBI waited at least three months before they informed the Pennington County Sheriff's Office of Poor Bear's possible testimony.

gunshot, and that petitioner and Russell Means then walked out of the rest room. Although both of these witnesses had known petitioner for a number of years, one witness misidentified petitioner and the other witness was unable to identify him at a preliminary hearing two months after the shooting.

Martin Montileaux made a number of statements to the police before his death six days after the shooting. These statements are at best contradictory. Montileaux identified the gunman as "Russell Means' friend," but there were a number of persons with Russell Means at the bar that night. Montileaux made the statement that only he and the gunman were in the rest room. The next day, however, Montileaux said there were two other men in the rest room, one of whom was Russell Means. Two days later Montileaux said that the two men were already in the rest room when he came in. Montileaux also said that the man who shot him had shaggy hair and was not wearing his hair in a pony tail. All of the other witnesses testified that petitioner had his hair in a pony tail on the night in question. Although Montileaux stated that his assailant was wearing an army field jacket, petitioner was not one of the men wearing army field jackets at the Longhorn Bar that night. Finally, Myrtle Poor Bear did not testify at the separate trial of Russell Means, at which Means was acquitted by a jury of the murder of Martin Montileaux.

In addition to the inconsistencies mentioned above, the testimony of Myrtle Poor Bear may have been the key evidence on several critical areas raised during the trial. Since petitioner was convicted of murder, the jury implicitly found that petitioner had a "premeditated design to effect death." This Court, in affirming petitioner's convic-

tion, termed the shooting a "planned execution." *State v. Marshall,* supra, 264 N.W.2d at 916. We also stated that a number of factors may go toward proving "premeditated design," viz: "the use of a lethal or deadly weapon; the manner of the killing; the accused's conduct before and after the killing; and whether or not there was provocation for the killing." *State v. Marshall,* supra, 264 N.W.2d at 916.

Myrtle Poor Bear testified that petitioner told her he asked someone if that was the right person and then waited for Montileaux and followed him into the rest room.[7] This is the only direct testimony that petitioner intended to kill Martin Montileaux. There was no evidence that petitioner brought a deadly weapon to the Longhorn Bar, nor was there any evidence that he knew or had reason to know that Martin Montileaux was in the Longhorn Bar. Poor Bear's testimony also provided the only theory regarding the possible motivation that petitioner had for killing Montileaux. Poor Bear testified that petitioner told her that Montileaux had beaten petitioner sometime prior to the shooting.

The fact that petitioner and Means immediately followed Montileaux into the rest room was evidence relating to the manner of killing and would tend to prove premeditated design. Whether or not petitioner immediately followed Montileaux into the rest room, however, was a disputed point at petitioner's trial. The following exchange took place between Deputy Phillips and Martin Montileaux several days before Montileaux died:

Q. Okay, and you said Russell [Means] was, had come in the bathroom with the other guy?

A. They were in there already.

Q. They what?

A. They were in there.

---

7. In contrast to this statement, Poor Bear testified that petitioner later told her that he didn't know why he shot Montileaux. The State attempted to explain this inconsistency when petitioner appealed his murder conviction to this Court in *State v. Marshall,* supra. The State, in its brief submitted on the earlier appeal, wrote that this statement "may mean that while [peti-

tioner] did, in fact, plan to kill the decedent at the direction of a second person, he did not himself know why the second person wanted the victim killed." Later the State makes the statement that "it is the State's belief that the jury probably believed the story that the killing was at the direction of the second person."

Q. Who wasn't in there?

A. They were in there.

Q. They were just in there?

A. Yeah, both of them.

Given the differences in the testimony of various witnesses and the lack of other independent evidence regarding premeditation, Myrtle Poor Bear's testimony assumed special importance. It can hardly be disputed that a defendant's admission, such as the one alleged in this case, ranks just short of a formal confession in terms of its impact upon a jury.

Although I adhere to this Court's statement in *State v. Marshall*, supra, that these inconsistencies were to be resolved by the jury, it is my opinion that given the apparent contradictions and differences in testimony a jury might have reached a different conclusion without Myrtle Poor Bear's testimony.

### III

The final standard under *Pickering* is whether the court is reasonably well satisfied that the testimony given by Myrtle Poor Bear, a material witness, is false.

As noted in *State v. Pickering*, supra, 260 N.W.2d at 235, recanted testimony must be scrutinized with extreme care. Indeed, based on Poor Bear's recantation alone, I might well agree with the post-conviction court's finding that her testimony at the murder trial was not false. In addition to Poor Bear's recantation of her testimony, however, there is the additional fact that immediately before her testimony in petitioner's trial she signed affidavits concerning another serious matter that so contradicted each other that she had to be lying in one or more or all of them.

Moreover, there are the statements of Mr. Hultman, who all but stated that Myrtle Poor Bear was lying when she said that she was at the site where the two FBI agents were killed. I am not disposed to take lightly statements made by a United States Attorney before a panel of judges in a United States Court of Appeals.

Finally, we have before us the medical history of Myrtle Poor Bear, which shows that she has a problem with alcohol and drugs, fabricates stories about rapes and shootings, and obviously has problems discerning reality from fantasy, a pattern of untruth and fantasy testified to by her own sister and father. In sum, the cumulative effect of this evidence persuades me that Poor Bear testified falsely at petitioner's murder trial.

I would hold that the circuit court erred in not granting petitioner a new trial.