**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Michael KAISER, Defendant
and Appellant.**

No. 17894.

Supreme Court of South Dakota.

Argued March 16, 1993.

Decided July 28, 1993.

Mark Barnett, Atty. Gen., Scott Bogue, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Leon J. Vander Linden and Kent Delaney of Delaney, Vander Linden & Delaney, Webster, for defendant and appellant.

AMUNDSON, Justice.

Michael Kaiser appeals from his conviction of two counts of conspiracy to commit murder. We reverse and remand.

### FACTS

On July 1, 1991, Roger Rohde (Rohde) disclosed to Day County Deputy Sheriff Tim Kwasniewski (Kwasniewski) that he had been part of a plan with Mike Kaiser (Kaiser) to kill Kaiser's ex-wife, Mary Wertman (Wertman), and her boyfriend, Bob Elijah (Elijah). Rohde informed Kwasniewski that he no longer intended to follow through with the plan and revealed items provided to him by Kaiser with which he was to murder Wertman and Elijah and escape undiscovered. Rohde and DCI agent Robert Grandpre (Grandpre) later placed two recorded telephone calls to Kai-ser in an attempt to confirm Rohde's allegations.

On July 3, 1991, Kwasniewski and Grandpre approached Kaiser in a parking lot in Webster, South Dakota, and told him they had "bad news for him." They then asked Kaiser to ride to the Day County Sheriff's Office with them because "we don't know who is safe and who is not safe." Grandpre and Kwasniewski both testified that they made no statements at that time about Wertman being dead. However, while riding to the sheriff's office, Kaiser turned to his daughter and said, "I think mom's dead."

Once at the station, Kwasniewski and Grandpre did misrepresent to Kaiser that his ex-wife had been murdered. Kaiser was administered his *Miranda* rights and questioned. Kaiser admitted to no involvement in a plan to kill his ex-wife and asked for an attorney. Kaiser was subsequently arrested and his home searched subject to a search warrant. He was charged by indictment with two counts of conspiracy to commit murder, entered a plea of not guilty, and proceeded to jury trial.

The first trial on October 28, 1991, ended with the court declaring a mistrial due to the fact there was a hung jury. The second trial commenced on January 21, 1992. The jury began deliberations on the morning of February 7, 1992. Twice on the first day of deliberations, the jury sent notes to the judge indicating they were unable to reach a unanimous decision. The judge answered these questions by directing their attentions to specific jury instructions addressing their deliberations. After spending the night at a local motel, the jury resumed deliberations the next day and again twice indicated to the judge their difficulty reaching a unanimous decision. After the judge again directed the jury's attention to the jury instructions, the jury returned a verdict of guilty on two counts of conspiracy to commit first-degree murder. Kaiser was subsequently sentenced to life imprisonment without parole. Other facts will be referred to hereinafter where applicable. Kaiser appeals his conviction and sentence.

## ISSUES

1) Whether the trial court erred by denying defendant's motion to suppress all oral statements made to authorities prior to his arrest?

2) Whether the trial court erred in admitting evidence seized pursuant to a search warrant?

3) Whether the trial court erred in denying defendant's motion for judgment of acquittal based upon insufficient evidence to sustain a finding of guilt beyond a reasonable doubt?

4) Whether the trial court's supplemental jury instructions regarding the continuation of deliberations were proper?

5) Whether the trial court erred in sentencing the defendant to life imprisonment without parole?

## ANALYSIS

Since Issue 4 is the pivotal point to be dealt with in this opinion, we will address it first.

*Jury Instructions*

■ As previously stated, this was a trial that lasted approximately three weeks. On Thursday, February 6, 1992, the jury was given the court's instructions and listened to the closing arguments of counsel. After the conclusion of closing arguments, the trial court sent the jurors home with instructions to report back to begin their deliberations on Friday, February 7, 1992, 9:00 a.m.

Then, jury deliberations commenced at 9:09 a.m. on Friday. The record reveals the following communications between the court and the jury during the two days of deliberations:

1. Jury Instruction #43 reads:

In order to return a verdict, each juror must agree thereto. The jurors have a duty to consult with one another and deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment. Each juror must decide the case for himself, but only after impartial consideration of the evidence with his fellow jurors. In the course of deliberations, a juror should not hesitate to re-examine his own views and change his

(1) At approximately 8:45 p.m. on the first day a note which reads in part "We cannot agree and the count stands at 11 guilty and 1 not guilty." To this inquiry, the court responded "Dear Jurors, Please continue to deliberate. Your attention is called to Court's Instruction #43.[1] In any future notes, please do not reveal your numerical count. Thank you for your efforts."

(2) At 10:15 p.m. the jury submitted the following note "We are not able to reach a unanimous decision. *We are losing ground each time we vote.*" The court responded to this note in part as follows: "Perhaps a good nights sleep would assist you. *Under South Dakota law I cannot allow you to return to your homes until a verdict has been reached.*[2] Therefore, I have secured motel rooms for you at the Holiday Motel here in Webster.... You are not to communicate with non-jurors or watch the news." (Emphasis added.)

Prior to sending the jurors to the motel, the trial judge stated in part to the jury in the courtroom:

I received your second note, says that you are still unable to make a unanimous decision. I realize that some of you are not as young as you once were and rather than force you to continue, I felt a good night's sleep would help. The state law does not allow me to send you home. That is forbidden by Supreme Court decision.

(3) Next, the jury presumably sent a note to the trial judge after they reconvened the next morning seeking a definition of "prudent." The trial judge answered this inquiry with the defini-

opinion if convinced it is erroneous. However, no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

2. This appears to send mixed messages to the jury about having to reach a verdict, when the only requirement is that any verdict reached must be unanimous.

tion from Webster's without objection from counsel for the parties.

(4) While the jury was deliberating on the second day, counsel for Kaiser made a motion for mistrial based upon the jury having disclosed its numerical count. This motion was denied and in doing so the trial judge stated:

We weren't gonna quit last night at 10:00. I think both sides want a resolution of this case. *A mistrial is in nobody's best interests as far as a hung jury.* And, therefore, that was the Court's exclusive reason for that, along with the age of a couple jurors who looked that they were in, shall we say, getting tired or in tough shape, having sat from 9 in the morning until 10 last night in a room with no windows and no ventilation. (Emphasis added.)

(5) At 10:15 a.m. on Saturday, the second day of actual deliberations, the jury again sent the following note to the judge: "If there is a stalemate as to guilty or not guilty what are the jurors supposed to do?" The court responded as follows:

The goal of the jury is to arrive at a unanimous determination as to whether the State had proved beyond a reasonable doubt that the Defendant is guilty of Count I or Count II or both.

This is a complex case. It took three weeks to present the evidence to you. It is understandable that time must be spent by the jury in examination and review of what has been presented to you.

I further call to your attention Instruction 42:

Consider this case carefully and honestly with due regard for the interests of society and the rights of the defendant. You should decide the case fairly and impartially without fear or favor upon the evidence produced and the instructions of the court. It must not be decided from any feeling of bias or prejudice against or sympathy for the defendant. Your duty upon such fair consideration of the case is to determine whether the defendant is guilty or not guilty of the offenses charged in the indictment.

Counsel for Kaiser objected to this response since it did not advise the jury that if hopelessly deadlocked, the court could declare a mistrial. The objection was overruled and the response was submitted to the jury as proposed by the judge.

(6) At 11:30 a.m., the fourth note came from the jury. "Judge ... Do some jurors have to change their minds on a guilty or not guilty plea if all possible avenues of discussion have been used?" The response to this inquiry was: "Dear Jurors. No one is forced to change their minds. Please see Instruction 43."

At 11:55 a.m., the jury returned its verdict finding Kaiser guilty on Counts I and II.

At no time during the lengthy jury deliberations on the first day, did the court bring the jurors back into the courtroom to inquire of them whether or not further discussions would be of any benefit. This was the case even after the court was advised on two separate occasions that the jury could not agree and were losing ground. It appears obvious from the court's comment to counsel that a mistrial this second time around was not an option.

In *Fields v. State*, 487 P.2d 831 (Alaska 1971), the Alaska Supreme Court held that an unguarded admonition by the trial court that the jury was to deliberate until it reached unanimous verdict was reason to reverse. A requirement that the trial end with either a verdict of guilty or not guilty is not the law, and the court stated that a "hung jury is a legitimate end of a criminal trial, and is the occasionally inevitable result of requiring a unanimous verdict beyond a reasonable doubt." *Id.* at 837. Further, as held in *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir.1971), "A jury, any number of juries, have a right to fail to agree."

In *State v. Place*, 20 S.D. 489, 107 N.W. 829 (1906), this court long ago held that a

jury's verdict must not be the result of coercion, but must be a product of each individual juror's free judgment.

No juror should be induced to agree to a verdict by a fear that a failure to so agree would be regarded by the public as reflecting upon either his intelligence or his integrity. Personal considerations should never be permitted to influence his conclusions, and the thought of them should never be presented to him as a motive for action. *Nor should the decision of a juror be influenced by a fear of indefinite confinement in a jury room to his own and his associates' inconvenience and discomfort.*

*Id.* at 491, 107 N.W. at 830 (citation omitted) (emphasis supplied).

Jury deliberations are a critical stage of the trial and the court requires a great degree of caution in insuring that nothing occurs which would taint the sanctity of this aspect of the American system of justice. It goes without saying that the actions and words of the trial judge have a definite impact on the jury. As the United States Supreme Court held in *Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354 (1946): "The influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." (Citations omitted.) This can particularly be the case where the jury knows that the trial judge is aware of its division when instructing them to continue to decide the case unanimously. *State v. McCutcheon*, 150 Ariz. 317, 723 P.2d 666, 669 (1986). When the trial court is aware of the numerical division and sends the jury back into deliberations with supplemental instructions, the jury's knowledge that the court is aware of how they stand can have the "doubly coercive effect of melting the resistance of the minority and freezing the determination of the majority." *See People v. Wilson*, 390 Mich. 689, 213 N.W.2d 193, 195 (1973). It has long been recognized that nothing should be done to make minority jurors feel obligated to forego their honest convictions in order to fulfill their duty, as instructed by the court, to arrive at a unanimous verdict. *People v. Lawson*, 56 Mich.App. 100, 223 N.W.2d 716, 720 (1974).

In this case, the jury had informed the court on four occasions that it was deadlocked or losing ground. The jury deliberated for approximately twelve hours on the first day in a jury room with no windows or ventilation. The court was aware that the jury stood eleven to convict and one to acquit (a person who could definitely be described as being in the minority). The jury was advised that they would not be leaving their windowless, stuffy room until a unanimous verdict on Count I and Count II was reached. The court, after twice learning of the deadlock, instructed the jurors to read instruction # 43.

In *United States v. Seawell*, 550 F.2d 1159, 1163 (9th Cir.1977), *cert. denied*, 439 U.S. 991, 99 S.Ct. 591, 58 L.Ed.2d 666 (1978), the court, in considering the giving of supplemental instructions to the jury after the trial court was advised of the jury's deadlock, stated:

If the charge is to pass muster as instruction on the law there is little need to repeat it save at the jury's request. (Here, for example, it was repeated three and one-half hours after it was first given. Nothing had intervened to cause the jury to overlook what last had been said to them.) Repetition of the charge, together with rejection of the jury's second report of deadlock, is almost certain to convey the thought that by failing to come to an agreement—by once again reporting themselves at impasse—the jurors have acted contrary to the earlier instruction as that instruction was properly to be understood. ("Apparently, you didn't listen to what I said before, so I'll repeat it.") Given a second time, ... the charge no longer serves as an instruction; ... it becomes a lecture sounding in reproof.

■■■ Claims that a jury verdict is the product of coercion are reviewed on a case-by-case basis under the totality of the circumstances. *State v. Brokemond*, 959

F.2d 206, 208 (11th Cir.1992). Trial judges have discretion in the handling of jury inquiries during its deliberations, but this does not extend to unbridled discretion to obtain a jury verdict.

■ While there must be a unanimous decision in order to return a verdict of guilty, there is no requirement in law that a jury must agree. *Jenkins v. United States*, 330 F.2d 220, 222 (D.C.Cir.1964) (Wright, J., dissenting), *rev'd*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965). "As a matter of fact, a hung jury can be a safeguard to liberty." *Id.*

We are not saying that the trial court intended to coerce a verdict in this case. However, under the applicable standard of review, an appellate court must review the totality of the circumstances to resolve whether or not the trial proceeding had a coercive taint. *Brokemond*, 959 F.2d at 208. In this case, such a review discloses: knowledge by the trial court of how the jury stood; clear evidence that jury was encountering difficulty in arriving at a verdict; jurors obviously tired after deliberating for hours in a windowless, stuffy room; statements that jury could not go home until the unanimous verdict is reached; tenor of trial court's statements regarding attributes of a hung jury; and the repetition of supplemental instructions to jury. These circumstances, when considered together, more than likely had an impact on this jury, especially upon the one minority juror. Since the jury trial is a fundamental right in the American system of justice, any potential coercion on the minority requires close scrutiny. Close scrutiny in this case leaves this court with firm conviction that this proceeding has a flavor of coercion which necessitates a new trial to ensure the defendant his fundamental right to a fair trial. Accordingly, we reverse and remand for a new trial.

While we need not reach the other issues as a result of our above holding, we nonetheless address issues 1 and 2 in order to provide guidance to the trial court on remand.

*Motion to Suppress Oral Statements*

■ Prior to trial, Kaiser moved to suppress statements made during his interrogation by Grandpre. The trial court denied the motion and allowed statements made to Grandpre entered as evidence. Kaiser alleges that the statements he made to Grandpre were not knowing or voluntary in that they resulted from Grandpre's misrepresentations to Kaiser that Wertman was dead. The trial court found Kaiser's statements to be voluntary. That finding is binding on us and will not be overturned unless we determine it to be clearly erroneous. *State v. Dickey*, 459 N.W.2d 445, 447 (S.D.1990); *State v. Gregg*, 405 N.W.2d 49, 52 (S.D.1987); *State v. Caffrey*, 332 N.W.2d 269, 271 (S.D.1983).

■ To determine whether an incriminating statement was voluntarily made, we must examine the totality of the circumstances. *Dickey*, 459 N.W.2d at 447. Deception or misrepresentation is a factor to be considered in evaluating the totality of the circumstances. *Gregg*, 405 N.W.2d at 53; *Caffrey*, 332 N.W.2d at 272. "[T]he question we must answer is not whether the interrogators' statements were the cause of [defendant's] confession, but whether those statements were so manipulative or coercive that they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess." *Dickey*, 459 N.W.2d at 448.

Grandpre told Kaiser that his ex-wife was dead and the authorities were not sure who was safe. This misrepresentation has no coercive effect. If Wertman were dead, it simply indicated to Kaiser that Rohde had carried out the plan. In addition, Grandpre stated to Kaiser that as a result of the murder they were not sure who was safe. This statement would indicate to Kaiser that the police were concerned for his safety and not considering him a suspect. These statements to Kaiser did nothing to imply to Kaiser that it would be advantageous to implicate himself in the murder. We do not find misrepresentations about Wertman's death to be so coercive as to render Kaiser's statements to Grandpre involuntary.

■ Moreover, before any claimed admissions can be ruled involuntary, the accused must have said something inculpatory. *Gregg,* 405 N.W.2d at 53. Kaiser does not state what testimony during his interview was inculpatory, nor does our examination of the record reveal that Kaiser at anytime during his interrogation admitted involvement in the murder scheme. The statements that Kaiser subsequently made while being questioned by Grandpre cannot be construed as inculpatory. Kaiser stated a suspicion of Wertman's involvement in drug activities as a possible reason for her death. He denied any phone calls with Rohde in the twenty-four hours previous to the interrogation and denied knowing what the pictures he received in the mail meant.[3] When Grandpre indicated that Kaiser was not telling the truth, Kaiser stopped the interview by requesting an attorney. Absent anything inculpatory, Kaiser's statements during the interrogation cannot be deemed involuntary.

■ The only statement made by Kaiser that could be considered inculpatory was his statement to his daughter, "I think mom's dead." Kaiser made this statement to his daughter while riding with the officers to the sheriff's office. The statement was made *before* Kaiser had been told that Wertman was dead and before he was questioned about her death. This comment, while inculpatory, was in no way coerced as the officers had only told Kaiser that they had some bad news for him. Kaiser's immediate assumption that his ex-wife was dead was a conclusion that he jumped to on his own volition. We do not find this comment a product of any coercion.

We therefore find Kaiser's statements to be voluntary. Accordingly, the trial court's denial of the motion to suppress is affirmed.

*Admission of Seized Evidence*

■ Kaiser next alleges that the trial court erred in allowing into evidence items seized at his residence pursuant to a search warrant. Prior to trial, Kaiser's motion to suppress the evidence seized during the search of his residence was denied. In his brief, Kaiser points to seventeen items admitted into evidence which he claims were not sufficiently set forth in the search warrant. However, Kaiser objected to only five of these items at trial. "This court has repeatedly held that reversible error cannot be predicated upon the denial of a motion in limine and that failure to specifically object to the evidence during trial forecloses complaint on the issue on appeal." *State v. Gallipo,* 460 N.W.2d 739, 743 (S.D.1990).

Kaiser attempts to circumvent this rule by claiming he had a standing objection to the admission of the evidence granted to him at his first trial and renewed at the second trial. However, the record is devoid of any such evidence. A transcript of the motions hearing for the first trial held on September 25, 1991, fails to reveal the granting of a standing objection. The first trial itself was not transcribed and thus there is no record of a standing objection granted at trial. While the transcript of the second trial does indicate that the trial court renewed its rulings on motions made at the first trial, it does not specifically mention any standing objection to evidence seized at Kaiser's residence. We cannot assume evidence or a record not clearly before us. Therefore, the admission into evidence of these twelve items which Kaiser failed to object to during trial has not been preserved for appeal.

■ Kaiser did raise objections to the admission of his checkbook, a marijuana pipe, and two roach clips on the grounds of relevance and to some marijuana seeds on grounds of foundation. "Since before the turn of the century we have consistently held that an objection to evidence worded in terms such as 'incompetent, irrelevant and immaterial' to be too general to preserve the issue on appeal." *State v. Rufener,* 392 N.W.2d 424, 427 (S.D.1986) *modi-*

---

**3.** Rohde testified that he and Kaiser had taken pictures of pornographic material in Wertman's home. Kaiser then had Rohde mail the undeveloped film to him from a different location in North Dakota and developed the film. Kaiser had hoped to use these photos to gain custody of his daughter.

*fied in part*, 401 N.W.2d 740 (S.D.1987). *See also* SDCL 19-9-3(1). Kaiser's objection at trial did not specifically mention that he believed the evidence inadmissible as a result of how it was seized; rather, Kaiser objected in general terms of relevance. Therefore, the nonspecific objections to the admission of the marijuana seeds, marijuana pipe, roach clips, and checkbook has not properly preserved for appeal the admission of this evidence. Since the trial court was not granted the opportunity to rule on specific objections, we are unable on appeal to determine whether the trial court abused its discretion.

This case is therefore reversed and remanded in accordance with this opinion.

MILLER, C.J., and WUEST and HENDERSON, JJ., concur.

SABERS, J., concurs in part and concurs specially in part.

SABERS, Justice (concurring in part; concurring specially in part).

I concur except that I write specially on the motion to suppress oral statements.

I caution against the *carte blanche* admission of these oral statements. Under *Miranda* and its progeny, Kaiser may have been entitled to be advised of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1]

[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* re-

fers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297, 307-08 (1980). Here, the officers orchestrated and taped the "rigged" telephone conversations during which Rohde, the co-conspirator, advised Kaiser that "Tonight's a good time to do Mary," and later, "Yeah, it's done." Then, the officers proceeded to transport Kaiser to the Sheriff's office on the pretense that they had "bad news for him" and that "we don't know who is safe and who is not safe." At that point, Kaiser was the *only* suspect. In fact, no crime was committed unless he committed one. Arguably, he was entitled to his *Miranda* warnings at that point. *See Innis*, 446 U.S. at 299, 100 S.Ct. at 1689, 64 L.Ed.2d at 306-07 (*Miranda* rules apply not only to police interrogation practices that involve express questioning of a defendant while in custody, but also to techniques of persuasion such as trickery in a custodial setting).[2]

---

1. The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station *or otherwise deprived of his freedom of action in any significant way....* Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege *must come into play at this point.* *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725 (emphasis added).

2. These questionable techniques of persuasion include several that do not involve express questioning.

   For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in

Therefore, statements made by Kaiser after being placed in the Sheriff's vehicle may be subject to suppression and excluded. *Id.; See also State v. Jenner*, 451 N.W.2d 710, 730–32 (S.D.1990) (Sabers, J., dissenting) (*Miranda* warnings necessary when defendant deprived of his freedom of action in a significant way). We must guard against turning *"Miranda's* unequivocal rule against any interrogation at all into a trap in which unwary suspects may be caught by police deception." *Innis*, 446 U.S. at 314, 100 S.Ct. at 1696, 64 L.Ed.2d at 316 (Stevens, J., dissenting).

order to escape the false prosecution. The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posit" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation. *Innis*, 446 U.S. at 299, 100 S.Ct. at 1689, 64 L.Ed.2d at 306–07 (citations omitted).