1996 SD 31

**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**William Joseph HELMER, Defendant
and Appellant.**

No. 18858.

Supreme Court of South Dakota.

Argued Oct. 16, 1995.

Decided March 27, 1996.

Mark Barnett, Atty. Gen., Scott Bogue, Asst. Atty. Gen., Pierre, SD, for plaintiff and appellee.

Michael Stonefield, Office of Pennington County Public Defender, Rapid City, SD, for defendant and appellant.

TUCKER, Circuit Judge.

[¶ 1] William Joseph Helmer (Helmer) appeals his conviction for first-degree murder which was entered and filed on July 8, 1994, before the Honorable Roland E. Grosshans, Seventh Judicial Circuit, Pennington County, Rapid City, South Dakota. We affirm.

## FACTS

[¶ 2] On the morning of November 15, 1993, a rural resident of Hill City, South Dakota, observed what appeared to be a human body laying approximately 20 feet or so from the edge of a Forest Service road. The resident flagged down a deputy sheriff and directed him to the scene.

[¶ 3] The deputy walked up to the body and observed that the corpse was headless and handless. He called for assistance and secured the area. Several officers and evidence technicians proceeded to gather evidence and investigate the scene for the remainder of the day. The next day, November 16th, officers followed foot prints which led down a fire trail to a campsite. They discovered bills and envelopes ad-

dressed to a "Tracy" with the last names of Elliot, Erickson and Helmer.

[¶ 4] Further investigation revealed that the mail belonged to Tracy Helmer who resided in Hot Springs, South Dakota. Later that evening on November 16th, law enforcement received a phone call from William Helmer inquiring as to why they were looking for his wife. Helmer agreed to come to the sheriff's office to discuss the death of a man near Hill City, but refused to bring his wife. Once Helmer arrived at the sheriff's office, he gave an extended, voluntary statement. Helmer stated he had been with his friends, Andrea Harris and Chris Draine, on the evening of November 14th, and denied any knowledge of Dixon's whereabouts or involvement in his death. Following the interview, Helmer agreed to accompany other law enforcement officers to the campsite.

[¶ 5] During Helmer's trip to the campsite, law enforcement in Rapid City located Harris and Draine, who denied that Helmer had been with them on the evening of November 14th. The conversation with Harris and Draine revealed another friend of Helmer's, a Joahn Hensen (Hensen). Law enforcement tracked down Hensen and asked her about Helmer's involvement in Dixon's death. Hensen initially denied any knowledge of the subject, but she subsequently revealed that she had witnessed the murder.

[¶ 6] Hensen told the following: In August of 1993, Hensen first met Helmer while she was working for his mother in Hill City. Later in October of 1993, Hensen met Helmer's wife Tracy and the victim, Randy Dixon (Dixon). Dixon had come to South Dakota with Helmer and his wife from Arizona. The four eventually became good friends, with all four sometimes staying at Hensen's house in Rapid City.

[¶ 7] On November 13th, Helmer and Dixon stayed overnight at Hensen's house. At approximately 4:00 or 5:00 p.m. on November 14th, Helmer insisted on driving out to his campsite to retrieve some personal belongings. He asked both Hensen and Dixon to accompany him. Hensen drove them to the intersection of China Gulch Road and Marshall Gulch Road, where she parked the car and all three walked to the campsite. When they arrived at the campsite, Helmer entered the trailer and handed Hensen a silver case. He also had a yellow bag, from which he extracted a nine millimeter submachine gun and handed the bag to Hensen to carry. In the meantime, Dixon was retrieving some items from a tent also located at the camp.

[¶ 8] When the three left to return to the car, Helmer was carrying a large green bag, a smaller bag, a coat, a flashlight and a double-bladed axe. Dixon arrived at the car first and was leaning against it smoking a cigarette. Hensen unlocked the trunk and walked to the driver's side, leaving Helmer and Dixon at the rear of the car. Hensen then heard a "very loud pop sound." She turned around, took a few steps and saw Helmer standing behind the car and Dixon lying on the ground with blood coming from his head. Helmer threw something in the trunk and told Hensen, "You know nothing and you saw nothing and you and your daughter will pay, if you do, you and your daughter will be next."

[¶ 9] Helmer then grabbed Dixon's body by the ankles and dragged it across and off the road. He returned to the car, grabbed the axe, walked back to the body and moved it again so it was approximately 50 feet from the edge of the road. Helmer told Hensen to get a flashlight and hold it towards him. She begged not to be made a part of it, but Helmer repeated his order. Hensen did as she was told, turned and looked away, and heard repeated thumps. When Hensen looked back, she could see that Dixon's head and hands had been chopped off. Helmer then returned to the car, retrieved some plastic bags, and walked back to the body. He placed the head in a bag, the hands in another bag and placed both into the car. He then returned to the body to retrieve Dixon's wallet and the axe, which he wiped off on the ground.

[¶ 10] Helmer ordered Hensen to get into the car and drove to Sheridan Lake Road. He pulled the car over on a gravel area near a steep overlook, turned the car and its lights off, removed the keys and exited the car. Helmer opened up the back door to the car and removed the bags. He walked back

behind the car, knelt down for a couple of seconds and then threw the bags one at a time over the edge of the overlook.

[¶ 11] Helmer entered the car and attempted to give Hensen one of Dixon's rings which she threw into the backseat of the car. He refused to take Hensen to pick up her daughter from the babysitter, instead driving them to Hensen's house. At the house, Hensen went into the bathroom and vomited. Helmer entered the bathroom and washed his hands. Upon her exit from the bathroom, Hensen again requested to go pick up her daughter from the sitter. Helmer again refused to do so and drove them to a bar called the Oyster Pub.

[¶ 12] Upon their arrival at the Oyster Pub, Helmer ordered oysters and a beer for himself and a soda for Hensen. Helmer remained at the bar chatting with the bartender and Hensen played lottery machines on the other side of the room. After Helmer finished his oysters, Hensen again requested to go pick up her daughter. Helmer agreed and proceeded to drive them to the sitter and then back to Hensen's house.

[¶ 13] At the house, Hensen and her daughter went into the bedroom and laid on the bed fully clothed. During this time, Hensen heard Helmer open and close the outside door more than once. Helmer eventually came and laid down on the bed next to Hensen and requested to have sex with her. Later that evening, Helmer told Hensen, "I have committed the perfect crime."

[¶ 14] The next day Helmer removed the license plates from Hensen's vehicle and told her to report them stolen.

[¶ 15] At approximately 3:00 a.m. on November 17th, Helmer and the law enforcement officers returned from their visit to the campsite. Helmer was then placed into custody and arrested later that morning for the murder of Randy Dixon.

[¶ 16] Helmer asserts the following issues on appeal:

I.  Did the trial court err in denying Helmer's motion to challenge the jury panels?

II. Did the trial court err in refusing to suppress Helmer's statements made to Officer Tracy Wiest?

III. Did the trial court err in failing to instruct the jury on the defense of insanity?

## DECISION

[¶ 17] **I. Did the trial court err in denying Helmer's motion challenging the make up of the jury panel?**

[¶ 18] Helmer asserts that the jury panel was drawn in violation of his constitutional and statutory right to a jury selected at random from a fair cross-section of the community.

[¶ 19] On March 7th of 1994, the trial court informed the parties that the jury pool for Helmer's trial would consist of a special panel drawn specifically for his trial, as well as the regular June panel already drawn for cases to be held in Pennington County. While reviewing the jury panels in May, Helmer's counsel noticed the lists contained a number of potential jurors who lived on the same streets. Helmer challenged the panel. The trial court conducted an evidentiary hearing on the selection of the jury panel and denied Helmer's challenge of the panel. The court specifically found that the random selection process as utilized substantially complied with the state's statutes and therefore the challenge of the jury selection process was not warranted.

[¶ 20] The Sixth Amendment to the United Stated Constitution requires that a jury be selected at random from a fair cross-section of the community. *St. Cloud v. Leapley*, 521 N.W.2d 118, 125 (S.D.1994); *State v. McDowell*, 391 N.W.2d 661, 664 (S.D.1986); and *State v. Hall*, 272 N.W.2d 308, 310 (S.D. 1978). Under SDCL 16–13–10.1:

> It is the policy of the State of South Dakota that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community, district or county where the court convenes....

[¶ 21] To successfully challenge a jury panel, the challenging party must show prej-

udice and deprivation of a substantial right. *Nebraska Electric Generation & Transmission Co-op., Inc. v. Markus,* 90 S.D. 238, 241 N.W.2d 142, 146 (S.D.1976)(citing *State v. Smith,* 57 S.D. 292, 232 N.W. 26 (S.D.1930)); *State v. Christians,* 381 N.W.2d 214, 215 (S.D.1986); *Broderson v. Slaughter,* 66 S.D. 377, 283 N.W. 470 (S.D.1938). The burden is upon the defendant to make a prima facie showing that the cross-sectional requirement has not been met. *State v. Arguello,* 502 N.W.2d 548, 553 (S.D.1993); *State v. Lohnes,* 432 N.W.2d 77, 83 (S.D.1988) (citing *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

[¶ 22] To establish a prima facie challenge, a defendant must show that: (1) the group excluded is a "distinct" group in the community; (2) the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to the systematic exclusion of the group from the jury selection process. *Arguello,* 502 N.W.2d at 553; *Lohnes,* 432 N.W.2d at 83–4 (citing *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970)).

[¶ 23] Helmer failed to meet his burden in showing there was a "distinct" group in Pennington County which was underrepresented in the jury selection process. Helmer's counsel necessarily admitted at oral arguments that there was no discriminatory elimination of a protected class during the selection process. Absent a showing of underrepresentation of a distinct group in the community, Helmer's challenge to the panel fails. This court declines to address the issue of whether the process used was random in nature or if such process met the specifications as required in applicable state statutes.

[¶ 24] **II. Did the trial court err in refusing to suppress Helmer's statements made to officer Tracy Wiest?**

[¶ 25] The defendant next claims that the trial court erred in failing to suppress an incriminating statement Helmer made to an officer while in custody in the early morning hours of November 17th. We agree, but rule that the error was harmless error given the overwhelming evidence in the record.

[¶ 26] On November 17, Helmer and law enforcement officers returned from the campsite near Hill city at approximately 3:00 a.m. Two Rapid City Police detectives interviewed Helmer in one of the detective's offices. At 3:11 a.m., the detectives started the first custodial interview of Helmer. The defendant was given the *Miranda* warnings which he claimed he understood. However, upon being asked whether he wanted to talk to the officers, Helmer said "No," that he wanted to talk to his wife and was tired. During the next five minutes, Helmer refused to speak to the officers and invoked his right to remain silent six different times. At 3:16 a.m., one of the detectives turned off the tape and momentarily left the room.

[¶ 27] At 3:17 a.m., the detective returned to the room, turned the tape back on, revealed to Helmer that his alibi had not checked out and stated that Joahn Hensen had told the story of what had happened. Helmer again invoked his right to remain silent by replying, "I don't wanna talk right now." Nonetheless, the detectives continued their interview with the defendant. Again, one detective left the room, but the other detective continued the interview. Helmer made several incriminating statements, but asked for the tape to be shut off at 3:32 a.m. At this time, both detectives, the one had re-entered during this interview, left the room and Officer Wiest entered for the sole purpose of watching Helmer while booking preparations were being made.

[¶ 28] Almost immediately, Helmer asked Wiest if Wiest knew why Helmer was there. Wiest replied that he had some knowledge, but that he didn't feel the need to know any more about it. Wiest suggested that Helmer discuss the matter with the Lord. At which point Helmer replied, "Maybe I'm crazy, but I don't know if God can forgive me for what I've done." Wiest told Helmer that he was

sure God forgives people for their wrongs. Helmer proceeded to look up at Wiest and say, "I knelt down before this and asked God to forgive me for the life I was about to take."

[¶ 29] One of the detectives returned to the room to take Helmer for the booking procedures. On their way to the booking area, Helmer asked the detective, "What can I get for this crime?"

[¶ 30] Later on November 17th, Helmer was scheduled to appear in Magistrate Court. At approximately 3:00 p.m., a different police officer appeared at the jail to interview Helmer. After he had read Helmer his *Miranda* rights, this officer asked Helmer if he wished "to talk to us now?" Helmer replied that it depended on what questions the officer was going to ask him. In response, the officer requested a "yes" or "no" answer and again asked, "Do you wish to talk to me now Bill?" Helmer answered, "Nothing personal but not really." The officer continued to interview Helmer, and Helmer agreed to talk with him, if he could talk to his wife first. The officer got Helmer's wife on the phone and the defendant spoke to her momentarily before they were disconnected. Helmer then finally agreed to talk to the officer and confessed to the crime.

■ [¶ 31] After *Miranda* warnings, if the suspect does not wish to speak and invokes the right not to speak, all interrogation must cease. *Edwards v. Arizona*, 451 U.S. 477, 481–2, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). As pertained to the statements made during the formal interviews, the trial court ruled that there had not been a voluntary and knowing waiver of any of Helmer's rights under *Miranda* and the statements were obtained as "a result of law enforcement's action overcoming the free will of Mr. Helmer." The trial court found that all of Helmer's statements made on November 17, except those made to Wiest, were obtained involuntarily and had been sufficiently tainted by law enforcement's prior actions to warrant their suppression. The trial court refused to suppress the statements made to Wiest based on the premise that Wiest did not solicit or initiate the conversation with Helmer. On appeal the State does not con-

test the trial court's suppression order. The inquiry of this Court is then limited to whether Helmer's statements to Wiest were freely and voluntarily made.

■■ [¶ 32] When preceding confessions or statements are inadmissible, subsequent statements are not automatically inadmissible, but they are suspect. *State of South Dakota v. Long*, 465 F.2d 65, 70 (8th Cir. 1972). "If from the facts, it is found that the two statements are so closely related as to taint the second, and there are no intervening events sufficient to purge the taint, the second must also be inadmissible." *Id.* at 70–71 (citing *Evans v. United States*, 375 F.2d 355, 361 (8th Cir.1967)). The connection between the improper interrogation and the final incriminating statement must be so attenuated as to dissipate the taint. *Stumes v. Solem*, 671 F.2d 1150, 1158 (8th Cir.1982)(citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The reasons for suppressing statements which follow an earlier involuntary statement parallels the reason for the suppression of the original statement. *People v. Badgett*, 10 Cal.4th 330, 41 Cal.Rptr.2d 635, 895 P.2d 877, 886 (1995)(citing *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)). The second statement should be suppressed as "it is involuntary in itself unless the taint of the first has been attenuated by the passage of time or other reasons." *Id.*

■ [¶ 33] This Court has previously addressed what factors must be analyzed to determine if the taint has been removed when statements are divulged to other law enforcement who were not present at the time of the unlawful conduct. Those factors include a removal in time and place from the original setting, an adequate advisement of the accused's constitutional rights, and the opportunity to exercise those rights. *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D.1990)(citing *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

■ [¶ 34] In this case, the necessary attenuating factors were simply not present to purge the taint of the earlier interrogation. The conversation with Wiest occurred in the

exact same room as the unlawful interrogation. It concerned the exact same subject matter as the interrogation. There was a constant presence of law enforcement in the room. Perhaps most importantly, the statements were made within a few minutes after the illegal interview. Finally, there was no intervening *Miranda* warning and waiver of those rights given.

[¶ 35] We cannot agree with the trial court's conclusion that sufficient attenuation existed due to a change in the atmosphere and the relationship between Helmer and Wiest. The only divergent factor between the two situations was that a different police officer was in the presence of the defendant. "Where an original confession is involuntary or secured by improper means, subsequent confessions of the same crime, though made to persons other than those to whom the original was made, are inadmissible as evidence, unless it appears from lapse of time, or otherwise, the influence which induced the original confession had been removed and the party confessing was no longer dominated by such influence." *State v. Whiteman*, 67 N.W.2d 599, 606 (N.D.1954). We do not find that the presence of a different law enforcement officer was adequate to substantially change the setting's atmosphere and erase the influence of domination that had been present minutes earlier. The change of officers, standing alone, does not create an attenuating factor sufficient to purge the taint of the preceding lawless conduct. Thus, this Court concludes that Helmer's statements to Wiest were not freely and voluntarily made.

[¶ 36] The State asserts, if the statements Helmer made to Wiest are inadmissible, such an error would be harmless, as an abundance of other evidence presented at trial supported the jury's verdict. Helmer claims that the statements to Wiest were the only evidence of premeditation or provided crucial support to what was otherwise limited evidence of premeditation. Without those statements Helmer claims the jury could have found that the homicide occurred in the heat of passion or as the result of provocation.

[¶ 37] In examining the admission of erroneous evidence, an appellate court must determine whether the defendant's case was prejudiced by the admission. *State v. Schuster*, 502 N.W.2d 565, 570 (S.D.1993). Prejudicial error can only be shown, if deletion of the erroneous evidence would cause the result of the trial to change. *Id.* at 570 (citing *State v. Blue Thunder*, 466 N.W.2d 613, 618–19 (S.D.1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967))). The violation of a defendant's constitutional right may constitute harmless error and therefore not require reversal, if this Court can declare beyond a reasonable doubt that the erroneous admission was harmless and did not contribute to the verdict which was obtained. *Id.* at 570 (citing *State v. Michalek*, 407 N.W.2d 815, 819 (S.D.1987)). We must inquire as to whether it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent the admission of Helmer's statements to Wiest. *Id.* at 570 (citing *United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983)). *See also United States v. Jones*, 16 F.3d 275, 279 (8thCir.1994) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)).

[¶ 38] Premeditation may be inferred from the facts and circumstances surrounding the murder. *State v. Corder*, 460 N.W.2d 733, 739 (S.D.1990)(citing *State v. Kost*, 290 N.W.2d 482, 486 (S.D.1980)). The significant factors to be considered in determining premeditation include: the use of a lethal or deadly weapon, the manner and nature of the killing, the defendant's conduct before and after the murder, and the determination of the presence or absence of provocation. *Id.* at 570 (citing *State v. Marshall*, 264 N.W.2d 911, 916 (S.D.1978); *State v. Feuillerat*, 292 N.W.2d 326, 331 (S.D.1980)).

[¶ 39] The evidence presented at trial revealed Dixon died from a single gunshot wound to the left side of the head and the murder weapon was a nine millimeter submachine gun owned by the defendant. Additionally, Helmer's actions prior to and following the shooting constitute actions of premeditation. Helmer initiated and direct-

ed the trip to the campsite. He knew the campsite was isolated and secluded. Helmer invited Dixon along, and the items Helmer retrieved from the camper (flashlight, gun, axe, sacks) facilitated either the act of murder or the disposal of evidence from the murder. Helmer's efforts to conceal the identity of Dixon; such as dragging the corpse off the road, cutting off the head and hands, placing the head and hands in bags which he subsequently threw off a cliff on Sheridan Lake Road, all strongly bolster the conclusion that Helmer's actions were premeditated and are demonstrative of calculated deliberation. The attempts to conceal or dispose of evidence support an implicit finding of premeditation. *Feuillerat*, 292 N.W.2d at 331. Further, Helmer's actions after the murder and dismemberment, the immediate threat to Hensen, his amiable nature at an oyster bar, the request for sex from Hensen, his comment on committing the perfect crime and the removal of the license plates from Hensen's vehicle, do not support a theory that the killing was the result of provocation or due to heat of passion. *Marshall*, 264 N.W.2d at 916. Finally, the. testimony presented at trial demonstrated there were no audible sounds of a struggle or a fight prior to the shot being fired.

[¶ 40] Therefore, in light of the evidence presented at trial, we find beyond a reasonable doubt that Helmer's statements to Wiest were not essential to the jury's verdict and that the jury would have convicted Helmer of premeditated murder without considering the statements. Thus, while Helmer's statements to Wiest were inadmissible, we find the admission to have been harmless error and affirm the conviction of Helmer for first degree murder.

### [¶ 41] III. Did the trial court err in failing to instruct the jury on the defense of insanity?

[¶ 42] Finally, Helmer claims the trial court erred in refusing to instruct the jury on the defense of insanity. A defendant is entitled to an instruction on his defense theory if there is evidence to support it and a proper request is made. *State v. Weather-*

*ford,* 416 N.W.2d 47, 55 (S.D.1987)(citing *State v. Esslinger,* 357 N.W.2d 525, 532 (S.D. 1984)). However, if no evidence supports the offered theory of the defense, a court is then not required to instruct on the matter. *State v. Jenner,* 451 N.W.2d 710, 720 (S.D.1990)(citing *Weatherford,* 416 N.W.2d at 55; *State v. Hoadley,* 319 N.W.2d 505, 507 (S.D.1982); *State v. Johnson,* 81 S.D. 600, 139 N.W.2d 232, 236 (S.D.1965)).

[¶ 43] The legal definition of insanity in South Dakota is found at SDCL 22–1–2(20) which reads as follows: " 'Insanity,' the condition of a person temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against him, he was incapable of knowing its wrongfulness, but not including an abnormality manifested only be repeated unlawful or antisocial behavior." For the trial court to be required to instruct the jury on the issue of insanity, evidence presented at trial would have had to support in some fashion the theory that Helmer was incapable of recognizing his acts were wrong at the time of the murder. *Jenner,* 451 N.W.2d at 721.

[¶ 44] As the trial court noted in its refusal of Helmer's proposed insanity defense instructions, "there is absolutely no evidence on the record that would support a finding that this Defendant was insane. His own experts say he was sane...." Psychologist, Dr. Mark Perrenoud and Psychiatrist, Dr. Stephen Manlove, both testified at trial for the defense. Dr. Perrenoud reiterated the contents of his final report which stated that Helmer had "no clear organic mental disorder" and a "good capacity for self-control." Dr. Manlove explicitly stated that Helmer "knew the difference between right and wrong" and was "sane at the time of the offense." Therefore, since no evidence was presented at trial which supported Helmer as being incapable of knowing his acts were wrong at the time Dixon was killed, the trial court correctly declined to instruct the jury on the defense of insanity. We affirm the conviction of first degree murder.

[¶ 45] SABERS and AMUNDSON, JJ., concur.

[¶ 46] MILLER, C.J., and GILBERTSON, J., concur in result.

[¶ 47] TUCKER, Circuit Judge, for KONENKAMP, J., disqualified.

GILBERTSON, Justice (concurring in result).

[¶ 48] I concur with the majority on Issues I and III. I concur in result only on Issue II.

[¶ 49] As the majority noted, our review of Helmer's self-initiated comments to Officer Wiest is limited to whether they were freely and voluntarily made. The trial court found Helmer's comments to be voluntary. This finding is binding on us and will not be overturned unless we determine it to be clearly erroneous. *State v. Larson,* 512 N.W.2d 732, 740 (S.D.1994); *State v. Kaiser,* 504 N.W.2d 96, 101 (S.D.1993); *State v. Dickey,* 459 N.W.2d 445, 447 (S.D.1990); *State v. Jenner,* 451 N.W.2d 710, 716 (S.D.1990) *cert. denied sub nom., Jenner v. Smith,* — U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *State v. Gregg,* 405 N.W.2d 49, 52 (S.D.1987); *State v. Caffrey,* 332 N.W.2d 269, 271 (S.D. 1983).

[¶ 50] In *Kaiser,* 504 N.W.2d at 101, we stated "[t]o determine whether an incriminating statement was voluntarily made, we must examine the totality of the circumstances." (citing *State v. Dickey,* 459 N.W.2d 445, 447 (S.D.1990)). "The trial court must have reviewed the totality of the circumstances surrounding the interrogation." *Jenner,* 451 N.W.2d at 716; (citing *State v. Albright,* 418 N.W.2d 292, 297 (S.D.1988); *State v. Faehnrich,* 359 N.W.2d 895, 898 (S.D.1984). *See also Caffrey,* 332 N.W.2d at 271; *State v. Lyons,* 269 N.W.2d 124, 126 (S.D.1978)). "In reviewing the trial court's findings on voluntariness, we consider the evidence in the light most favorable to the finding." *Jenner,* 451 N.W.2d at 716 (citing *State v. Volk,* 331 N.W.2d 67, 70 (S.D.1983)).

[¶ 51] A review of the totality of the circumstances here indicates Helmer's conversation with Wiest was voluntary. Prior to interrogation by Officers Moore and Eisenbraun, Helmer had received *Miranda* warnings and stated he understood them. Helmer, in fact, refused to waive these rights and had exercised them. The trial court found the subsequent interrogation by Moore and Eisenbraun to be in violation of those rights and suppressed Helmer's statements to these two officers.

[¶ 52] When Helmer made his comments to Wiest, however, interrogation had ceased and Moore and Eisenbraun had exited the room. Wiest then entered, as the majority notes, "for the sole purpose of watching Helmer while booking preparations were being made." Wiest did not question Helmer at all and stated he tried to steer away any conversation about the crime. Nevertheless, *Helmer initiated conversation with Wiest* almost immediately, and on the very subject Wiest sought to avoid, by asking Wiest, "[d]o you know what I'm here for?"

[¶ 53] Apart from the fact that interrogation by Moore and Eisenbraun had ceased and that Wiest asked him no questions regarding the crime, Helmer's *initiation* of conversation with Wiest evidences voluntariness. In *Jenner,* 451 N.W.2d at 717, we looked to the defendant's subjective state of mind as an indication of whether her statements were freely and voluntarily made. Therein, we noted Jenner's state of mind was indicated by her "oral expressions" which weakened "any supposition that her will was overborne." *Id.* Had Helmer not felt free to solicit conversation from Wiest, he would not have done so. He was under no compulsion to speak or respond to Wiest in any manner. He did not choose to resist conversation with Wiest as he did earlier with Moore and Eisenbraun. I believe Helmer's initiation of conversation demonstrates a state of mind consistent with the trial court's finding that the statements were freely and voluntarily made.

[¶ 54] Helmer's conduct certainly evidences no fear of law enforcement or that his will was likely to be overborne. He initially bragged to Henson that he had committed the perfect crime. Later when he learned his wife was being sought for questioning by law enforcement, rather than fleeing, he brazenly telephoned the police station and demanded to know why the police were looking for his wife. Following this telephone call,

Helmer voluntarily presented himself to the police for an interview, but refused to bring his wife. As noted above, when informed of his *Miranda* rights, he initially invoked them. The record further reflects Helmer was 24 years old at the time of his arrest and no stranger to the criminal justice system, having both a juvenile and adult criminal record.*

[¶ 55] In *Larson*, 512 N.W.2d at 741, we acknowledged "[t]he taint of the lawless conduct does not last forever." (citing *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D.1990)).

> When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.

*Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222, 232–33 (1985). Although the time was not lengthy that passed between Helmer's statements which were eventually suppressed and the conversation he had with Wiest, and both the statements occurred in the same place, the change in identity of officers was the event of major significance. *See Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993) (finding a change of officers to be more significant than a change of locations). The change in officers here represented not only a change of individual identity but a change of purpose as well. Helmer was no longer under interrogation but was merely being watched while booking preparations were made. The tape recorder, which had recorded Helmer's interrogation by Eisenbraun and Moore and which was turned off at Helmer's request, was no longer running. Wiest was not part of the investigative team assigned to this case and had, in fact, finished his shift when he was asked to step in and watch Helmer. Helmer's almost immediate initiation of conversation with Wiest

when he stepped into the room indicates Helmer recognized this shift in atmosphere.

[¶ 56] The facts now before us are similar to those in *Kaiser*. Therein, we held Kaiser's statement, "I think mom's dead," to be voluntary and "in no way coerced" as it was made by Kaiser on his own volition to a prior statement by law enforcement officers rather than in response to a question. Here, Helmer did not initiate his comments in response to either a statement or question by Wiest. Helmer commenced the conversation of his own accord. Thus the facts here support a finding of voluntariness even more so than in *Kaiser*.

[¶ 57] "The Fifth Amendment ... is not ... concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Elstad*, 470 U.S. at 304–05, 105 S.Ct. at 1290, 84 L.Ed.2d at 229. "Volunteered statements of any kind are not barred by the Fifth Amendment. . . ." *Miranda v. State of Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). Helmer's comments to Wiest about Helmer's religious beliefs and divine forgiveness for such a crime reflect such an outpouring of which the Fifth Amendment is not concerned. I would hold Helmer's conversation with Wiest was voluntarily made and was sufficiently attenuated from the inadmissible statements to remove the taint in this instance.

[¶ 58] MILLER, C.J., joins this special writing.

---

* Helmer's juvenile record demonstrates he was arrested for eight counts of intentional damage to private property, and at other times, for driving a vehicle, not his own, over a cliff, and for stealing hood ornaments. As an adult, Helmer was arrested for eluding a police officer and possession of stolen property. One year later, Helmer was arrested for grand theft, intentional damage to property, and eluding a police officer.